ESTATE OF Brianna KRIEFALL, deceased,
by her Special Administrator, Douglas A. Kriefall,
Connie J. Kriefall and Chad Kriefall, a minor,
by his Guardian ad Litem, Plaintiffs,

v.

SIZZLER USA FRANCHISE, INC.,
Defendant-Respondent-Cross-Appellant-
Cross Petitioner,

E & B MANAGEMENT CO., Waukesha, d/b/a Sizzler,
Sizzler USA and Secura Insurance, Defendants,

EXCEL CORPORATION and American Home
Assurance Co., Defendants-Appellants-
Cross-Respondents-Petitioners.

ESTATE OF BRIANNA KRIEFALL, deceased, by her
Special Administrator, Douglas A. Kriefall,
Connie J. Kriefall and Chad Kriefall, a minor,
by his Guardian ad Litem, Plaintiffs,

v.

SIZZLER USA, Defendant,

SIZZLER USA FRANCHISE, INC.,
Defendant-Respondent-Cross Petitioner,

SECURA INSURANCE,
Defendant-Respondent-Cross-Appellant,

E & B MANAGEMENT Co., Waukesha,
d/b/a Sizzler, Defendant-Respondent-Cross-
Appellant-Cross Petitioner,

AMERICAN HOME ASSURANCE Co. and
Excel Corporation, Defendants-Appellants-
Cross-Respondents-Petitioners.

Supreme Court

*No. 2009AP1212 & 2010AP491.*
*Oral argument January 13, 2012.*
*—Decided June 29, 2012.*

2012 WI 70

(Also reported in 816 N.W.2d 853.)

For the defendants-appellants-cross-respondents-petitioners there were briefs filed by *Nora E. Gierke, Rebecca E. Frihart* and *Reinhart Boerner VanDeuren, S.C.,* Milwaukee, *William C. Buhay, Earl W. Gunn, David I. Matthews* and *Weinberg, Wheeler, Hudgins, Gunn & Dial, LLC,* Atlanta, *Barbara I. Michaelides, Paula M. Carstensen* and *Bates, Carey Nicolaides, LLP,* Chicago, and oral argument by *Paula M. Carstensen.*

For the defendants-third-party-plaintiff-appellant there were briefs filed by *Terry E. Johnson, Ronald G. Pezze, Jr.* and *Peterson, Johnson & Murray, S.C.* Milwaukee and oral argument by *Terry E. Johnson.*

For the defendant-respondent-cross petitioner there were briefs filed by *Russell A. Klingaman, Noah D. Fiedler* and *Hinshaw & Culbertson LLP,* Milwaukee, *Frederic L. Gordon* and *Gordon & Holmes, APC,* San Diego, and oral argument by *Frederic L. Gordon.*

¶ 1. PATIENCE DRAKE ROGGENSACK, J. This is a review of a published decision of the court of appeals[1] that affirmed in part and reversed in part the judgment of the Circuit Court for Milwaukee County.[2] The questions before this court stem from damages sustained because of food contaminated by E. coli 0157:H7 pathogens at two Sizzler Steak House restaurants in the Milwaukee area.[3] The plaintiffs in the

---

[1] *Estate of Kriefall v. Sizzler USA Franchise, Inc. (Kriefall II),* 2011 WI App 101, 335 Wis. 2d 151, 801 N.W.2d 781. The first case involving the Kriefalls, *Estate of Kriefall v. Sizzler USA Franchise, Inc. (Kriefall I),* 2003 WI App 119, 265 Wis. 2d 476, 665 N.W.2d 417, addressed issues of federal preemption and has no bearing on our decision today.

[2] The Honorable Charles F. Kahn, Jr. presided.

[3] E. coli 0157:H7 is a type of bacteria that can cause stomach cramping, diarrhea, vomiting, and fever; in some cases, the

underlying actions settled years ago, and the claims now before us relate to the apportionment of liability and costs among those who were defendants in the underlying actions.

¶ 2. The parties raise five issues, and we affirm the decision of the court of appeals on all issues. First, we hold that Sizzler is entitled to recover consequential damages for Excel's breach of implied warranties in the parties' meat supply contract, notwithstanding limiting language in the Continuing Guaranty. Second, Sizzler also is entitled to indemnity from Excel for the entirety of Sizzler's $1.5 million advance partial payment to the Kriefall family because the payment was not voluntary and the jury found that Sizzler was zero percent liable for the E. coli contamination. Third, pursuant to the Hold Harmless Agreement and Guaranty/Warranty of Product (Hold Harmless Agreement), Excel is required to indemnify E&B for payments E&B made to certain non-Kriefall plaintiffs in exchange for *Pierringer* releases;[4] however, Excel's obligation extends only so far

infection may be life threatening. Center for Disease Control and Prevention, Escherichia coli 0157:H7 and other Shiga toxin-producing Escherichia coli (STEC), http://www.cdc.gov/nczved/divisions/dfbmd/diseases/ecoli_o157h7/#what (last visited June 22, 2012). The E. coli 0157:H7 bacteria occurs naturally in the digestive tracts of ruminant animals such as cattle. *Id.* A major cause of human infection from E. coli 0157:H7 is consumption of food that has been in contact with feces of cattle. *Id.* Although numerous forms of E. coli bacteria exist, the primary source of human sickness is 0157:H7. *Id.* Accordingly, all subsequent discussion of E. coli refers to the 0157:H7 form.

[4] Such releases derive their name from the form of release approved by this court in *Pierringer v. Hoger,* 21 Wis. 2d 182, 124 N.W.2d 106 (1963). A *Pierringer* release imputes to the settling plaintiff any liability in contribution that the settling defendant may have. *Id.* at 193.

40

as its apportioned liability, which is 80 percent. Fourth, Excel is not required to indemnify E&B for payments that Federal Insurance Company made on E&B's behalf in settling the non-Kriefall plaintiffs' claims. Fifth, and finally, notwithstanding the jury's determination that Sizzler was zero percent responsible for the E. coli contaminated food that caused the illnesses of so many people, Sizzler may not recover attorney fees from Excel because the exception to the American Rule stated in *Weinhagen v. Hayes*, 179 Wis. 62, 190 N.W. 1002 (1922), does not apply here.

## I. BACKGROUND

¶ 3. In late July and early August 2000, approximately 150 people became ill from ingesting food contaminated with E. coli at two Sizzler Steak House restaurants in the Milwaukee area. Their illnesses ranged from diarrhea and cramps to, in the case of three-year-old Brianna Kriefall, death.

¶ 4. Excel Corporation processed and distributed the contaminated meat that was the source of the E. coli pathogens. Excel's role in the contamination was confirmed by tests of sealed packages of Excel's tri-tip beef that had been shipped to Sizzler restaurants; also, Excel eventually stipulated to its meat having been the source of the E. coli.

¶ 5. Excel's contaminated meat was distributed to franchisees of Sizzler USA Franchise, Inc. (Sizzler). Sizzler's franchisee here, E&B Management Co., Waukesha (E&B), operated two Sizzler Steak House restaurants in the Milwaukee area. E. coli contamination occurred at both restaurants, although the Wisconsin Department of Health and Family Services classified the two outbreaks as separate occurrences, caused

by different food handling errors. There was testimony at trial that numerous food handling procedures employed at E&B's Sizzler restaurants failed to comply with established standards for safe food handling, including using the same utensils to handle raw meat and ready-to-eat foods, cutting raw meat near ready-to-eat foods, and storing raw meat and ready-to-eat foods in close proximity.

¶ 6. Many of those sickened by the Milwaukee E. coli contamination asserted claims against Excel, Sizzler, E&B, E&B's shareholders, and Sysco Food Services of Eastern Wisconsin, the local distributor for Excel's meats. The claims included negligence, strict liability, and breaches of implied warranties of merchantability and fitness. Over the course of negotiations and pre-trial preparations, the plaintiffs' claims were broadly classified into two groups. One group, the Kriefall plaintiffs, includes Brianna Kriefall's estate, and Brianna's mother, father and brother. The plaintiffs in the second group, referred to collectively as the "non-Kriefall plaintiffs," have proceeded separately and were subject to different settlement proceedings than the Kriefall plaintiffs.

¶ 7. Prior to trial, the Kriefall plaintiffs settled with Excel, E&B, Sizzler, and their insurers.[5] The Kriefalls received $10.5 million, including $8.5 million in settlement of claims against Excel, and $2 million in settlement of claims against E&B and Sizzler. Excel paid the entire $10.5 million amount.

¶ 8. The 138 non-Kriefall plaintiffs also settled their claims. The plaintiffs received differing amounts, depending on the severity of their injuries. Settlements

---

[5] Sysco Food Services of Eastern Wisconsin and E&B's shareholders were given releases. Those parties' liability is not at issue here.

for the non-Kriefall claims were paid from a fund administered by one of E&B's insurers, Secura Insurance Co. The fund included the policy limits under E&B's Secura policy, $3.5 million, as well as another $1 million from Federal Insurance that provided coverage to E&B as an additional insured under a policy issued to Sizzler. In total, the non-Kriefall plaintiffs were paid approximately $3.5 million. The remaining amount from the settlement fund, approximately $1 million, was paid to the Kriefalls on behalf of Sizzler as an advance payment pursuant to Wis. Stat. § 885.285 (2009–10).[6]

¶ 9. After all of the plaintiffs' claims were settled, Excel, Sizzler, E&B and their respective insurers went to trial to apportion liability among them. The jury found that Excel was 80 percent liable, E&B was 20 percent liable, and Sizzler was not liable. The parties then sought to apply certain contractual and common law doctrines in the assignment of the ultimate responsibility for the settlement amounts among themselves.

¶ 10. Much of the parties' dispute turns on three components of the contractual relationship governing Excel's distribution of meat to Sizzler's restaurants. First, the Boxed Beef Sales Confirmation and Contract (Boxed Beef contract) affected Excel and Sizzler's relationship for the sale and purchase of meat products. That document, renewed yearly, set forth the amounts of certain cuts of beef that Sizzler agreed to purchase from Excel. The Boxed Beef contract included tri-tip steaks that were the source of the E. coli contamination at the Milwaukee Sizzler restaurants.

---

[6] All subsequent references to the Wisconsin Statutes are to the 2009–10 version unless otherwise indicated.

¶ 11. Second, in 1997, Excel had sought to participate as a supplier of meat for Sizzler's restaurants.[7] In the parties' agreement, Excel was required to provide Sizzler with a guaranty that Excel's beef products complied with various federal, state and local food safety laws. This guaranty, referred to as the "Continuing Guaranty," provides, in relevant part:

> Excel Corporation (Seller), hereby states that each and every article contained in and comprising each shipment or other delivery hereafter made by Seller, to or on the order of Sizzler International, Inc. (Buyer), is hereby guaranteed, as of the date of each such shipment or delivery, to be:
>
> 1. Not adulterated or misbranded within the meaning of the Federal Food, Drug and Cosmetic Act . . . .
>
> . . . .
>
> This Guaranty shall not render Seller liable for any incidental or consequential damages of whatsoever nature nor shall it extend to the benefit of persons or corporations other than Sizzler International, Inc. or its affiliates.[8]

¶ 12. Third, Excel entered into a Hold Harmless Agreement with its regional distributor, Sysco Food Services of Eastern Wisconsin. The Hold Harmless Agreement provides, in relevant part, that Excel, as Seller:

---

[7] Excel had previously participated as one of Sizzler's meat suppliers, but after a separate E. coli outbreak in the early 1990s, which Sizzler suspected was attributable to Excel meat, Sizzler terminated Excel as a meat supplier.

[8] It is undisputed that Sizzler USA Franchise, Inc. is an "affiliate" of Sizzler International, Inc.; Sizzler USA is a wholly owned subsidiary of Sizzler International. Sizzler International, Inc. has had no role in this litigation, and any reference to "Sizzler" refers to Sizzler USA Franchise, Inc.

agrees to defend, indemnify and hold harmless Buyer and its employees, officers, directors and customers (individually, an "Indemnitee") from all actions, suits, claims and proceedings ("Claims"), and any judgments, damages, fines, costs and expenses (including reasonable attorneys' fees) resulting therefrom . . . provided, however, that Seller's indemnification obligations hereunder shall not apply to the extent that Claims are caused by the negligent acts or omissions of Buyer or any other third party.

Excel does not dispute that under the language of the Hold Harmless Agreement, E&B is covered as a "customer" of the Buyer, Sysco Corp.

¶ 13. With this background, we turn to the discussion of the parties' individual claims before this court.

## II. DISCUSSION

### A. Standard of Review

¶ 14. Some of the issues turn on the language of the parties' contracts. Contract interpretation presents a question of law that we review independently of previous decisions of the circuit court and the court of appeals, but benefitting from their discussions. *Admanco, Inc. v. 700 Stanton Drive, LLC*, 2010 WI 76, ¶ 15, 326 Wis. 2d 586, 786 N.W.2d 759. We are also required to interpret and apply statutes that interact with the parties' contracts, which present additional questions of law for our independent review. *See Columbus Park Hous. Corp. v. City of Kenosha*, 2003 WI 143, ¶ 9, 267 Wis. 2d 59, 671 N.W.2d 633.

¶ 15. In regard to Sizzler's claim for equitable indemnification, we are asked to review the court of

45

appeals' reversal of the circuit court's discretionary denial of equitable relief to Sizzler. Discretionary decisions are upheld if they are based on the relevant facts and apply a proper standard of law. *Wynhoff v. Vogt*, 2000 WI App 57, ¶ 13, 233 Wis. 2d 673, 608 N.W.2d 400. However, "[a]n exercise of discretion based on an erroneous application of the law is an erroneous exercise of discretion." *State v. McCallum*, 208 Wis. 2d 463, 473, 561 N.W.2d 707 (1997).

¶ 16. Finally, whether a party is entitled to attorney fees under an undisputed factual scenario is a question of law that we review independently. *See DeChant v. Monarch Life Ins. Co.*, 200 Wis. 2d 559, 568, 547 N.W.2d 592 (1996).

## B. Implied Warranties

¶ 17. The first issue we consider is whether the limitation of damages provision set out in the Continuing Guaranty prevents Sizzler from recovering consequential damages for Excel's breach of the implied warranties of merchantability and fitness.[9] The circuit court granted summary judgment in favor of Excel on Sizzler's claim for consequential damages for breach of the warranties expressed in the Continuing Guaranty. However, the circuit court allowed Sizzler to proceed to the jury on consequential damages on a theory of breach of implied warranties of merchantability and fitness under the Boxed Beef contract.

¶ 18. In allowing the claim under the Boxed Beef contract's implied warranties to proceed, the circuit court reasoned that the language of the Continuing

---

[9] Sizzler sought lost profits, franchise fees, and out-of-pocket expenses as consequential damages.

Guaranty applied to those warranties created by the Continuing Guaranty, but that the Guaranty did not address the implied warranties of fitness and merchantability. The court reasoned that provisions of the Uniform Commercial Code (UCC), Wis. Stat. § 402.314 and Wis. Stat. § 402.315, provide warranties that are implied in every contract for the sale of goods, unless expressly excluded. Therefore, the terms of the Continuing Guaranty did not affect implied warranties under the Boxed Beef contract.

¶ 19. The jury awarded Sizzler $7,161,000 as damages for Excel's breaches of implied warranties of fitness and merchantability. The court of appeals affirmed, concluding that "the incidental-and-consequential-damages limitation in the Continuing Guaranty applies only to any breach of express warranties *created* by that agreement . . . and thus the limitation did not extend beyond the four corners of the Continuing Guaranty." *Estate of Kriefall v. Sizzler USA Franchise, Inc. (Kriefall II)*, 2011 WI App 101, ¶ 16, 335 Wis. 2d 151, 801 N.W.2d 781.

¶ 20. It is under the implied warranties of merchantability and fitness that the jury awarded damages. However, Excel contends that the Continuing Guaranty should be read to prevent the claims for breach of implied warranties, even though neither the Continuing Guaranty nor the Boxed Beef contract mentions implied warranties of merchantability or fitness.

¶ 21. Our consideration of the parties' positions requires us to interpret two contracts, the Continuing Guaranty and the Boxed Beef contract. When we interpret contracts, we do so to determine and give effect to the intentions of the parties. *Steffens v. BlueCross BlueShield of Illinois*, 2011 WI 60, ¶ 46, 335 Wis. 2d

514, 804 N.W.2d 196. We presume their intentions are expressed in the language of the contract. *Id.* Where the language of a contract is unambiguous and the parties' intentions can be ascertained from the face of the contract, we give effect to the language they employed. *Solowicz v. Forward Geneva Nat'l, LLC*, 2010 WI 20, ¶ 36, 323 Wis. 2d 556, 780 N.W.2d 111. Furthermore, our interpretation of contracts involving a transaction in goods also may be affected by provisions of the Wisconsin UCC, Wis. Stat. ch. 402. *See Linden v. Cascade Stone Co., Inc.*, 2005 WI 113, ¶ 9, 283 Wis. 2d 606, 699 N.W.2d 189.

¶ 22. In the case before us, provisions of the Wisconsin UCC do affect the parties' obligations because transactions in goods are at issue; therefore, we consider Wis. Stat. ch. 402 as we construe the parties' written agreements. Chapter 402 provides that a contract for a transaction in goods includes certain implied warranties, unless such warranties are expressly excluded or modified. Wis. Stat. § 402.316.

¶ 23. In particular, Wis. Stat. § 402.314 provides that contracts for the sale of goods include an implied warranty of merchantability if the seller is a merchant with respect to the type of goods sold.[10] Excel was a

---

[10] Wisconsin Stat. § 402.314 provides:

(1) Unless excluded or modified (s. 402.316), a warranty that the goods shall be merchantable is implied in a contract for their sale if the seller is a merchant with respect to goods of that kind. . . .

(2) Goods to be merchantable must be at least such as:

. . . .

(c) Are fit for the ordinary purposes for which such goods are used[.]

. . . .

merchant with respect to the beef it sold. Wis. Stat. § 402.104(3). Wisconsin Stat. § 402.315[11] provides that contracts for the sale of goods also include an implied warranty that the goods will be fit for the purpose for which the goods are required, unless such warranty is excluded or modified under Wis. Stat. § 402.316.

¶ 24. In addition to excluding or modifying warranties pursuant to Wis. Stat. § 402.316, a seller also may limit his exposure to damages by limiting the remedies to which a buyer is entitled. Wis. Stat. § 402.719; *see Murray v. Holiday Rambler, Inc.*, 83 Wis. 2d 406, 414, 265 N.W.2d 513 (1978) (explaining that a seller may restrict a buyer's claims in two ways—by expressly disclaiming all implied warranties pursuant to § 402.316 or by limiting the buyer's remedies pursuant to § 402.719).

¶ 25. Wisconsin Stat. § 402.316, to which Wis. Stat. § 402.314 and Wis. Stat. § 402.315 refer, provides specific methods by which a party may exclude or modify warranties otherwise available. Section 402.316 provides, in pertinent part:

> (1) Words or conduct relevant to the creation of an express warranty and words or conduct tending to negate or limit warranty shall be construed wherever reasonable as consistent with each other; but subject to

---

(3) Unless excluded or modified (s. 402.316) other implied warranties may arise from course of dealing or usage of trade.

[11] Wisconsin Stat. § 402.315 provides:

Where the seller at the time of contracting has reason to know any particular purpose for which the goods are required and that the buyer is relying on the seller's skill or judgment to select or furnish suitable goods, there is unless excluded or modified under s. 402.316 an implied warranty that the goods shall be fit for such purpose.

s. 402.202 on parol or extrinsic evidence, negation or limitation is inoperative to the extent that such construction is unreasonable.

(2) Subject to sub. (3), to exclude or modify the implied warranty of merchantability or any part of it the language must mention merchantability and in case of a writing must be conspicuous, and to exclude or modify any implied warranty of fitness the exclusion must be by a writing and conspicuous. Language to exclude all implied warranties of fitness is sufficient if it states, for example, that "There are no warranties which extend beyond the description on the face hereof."

(3) Notwithstanding sub. (2), all of the following apply:

(a) Unless the circumstances indicate otherwise, all implied warranties are excluded by expressions like "as is", "with all faults" or other language which in common understanding calls the buyer's attention to the exclusion of warranties and makes plain that there is no implied warranty.

. . . .

(4) Remedies for breach of warranty can be limited in accordance with ss. 402.718 and 402.719 on liquidation or limitation of damages and on contractual modification of remedy.

¶ 26. Neither the Continuing Guaranty nor the Boxed Beef contract employs any method set out in Wis. Stat. § 402.316 for excluding implied warranties of merchantability and fitness. Neither contract mentions implied warranties of merchantability or fitness.

¶ 27. The language of the Continuing Guaranty is clear and unambiguous. No exclusion of implied warranties is mentioned; therefore, we will create none.

*Columbia Propane, L.P. v. Wis. Gas Co.*, 2003 WI 38, ¶ 12, 261 Wis. 2d 70, 661 N.W.2d 766 (explaining that when a contract is expressed in plain language, we will not rewrite the agreement that the parties made).

¶ 28. Excel also contends that a provision in the Continuing Guaranty is intended to bar recovery of incidental and consequential damages, no matter under which contract a breach has occurred. This argument requires us to examine Wis. Stat. § 402.719, to which Wis. Stat. § 402.316(4) refers, with regard to limitation of remedies for breach of the implied warranties. Wisconsin Stat. § 402.719 provides in relevant part:

> (3) Consequential damages may be limited or excluded unless the limitation or exclusion is unconscionable. Limitation of consequential damages for injury to the person in the case of consumer goods is prima facie unconscionable but limitation of damages where the loss is commercial is not.

¶ 29. Prior cases have construed Wis. Stat. § 402.719(3), parsing whether an expressed limitation of consequential damages was unconscionable. *See Sunnyslope Grading, Inc. v. Miller, Bradford & Risberg, Inc.*, 148 Wis. 2d 910, 437 N.W.2d 213 (1989); *Trinkle v. Schumacher Co.*, 100 Wis. 2d 13, 301 N.W.2d 255 (Ct. App. 1980). However, those cases find no application here because they did not address claims for implied warranties of merchantability or fitness, and further, Excel included no language to limit damages for the breach of those implied warranties.

¶ 30. In addition, Excel's reliance on the statement in the Continuing Guaranty that "This Guaranty shall not render Seller liable for any incidental or consequential damages of whatsoever nature" is misplaced because the statement cuts against Excel's posi-

51

tion before us. The words, "This Guaranty," focus the limitation of damages on those damages that may flow from a breach of the express warranties set out in "This Guaranty," i.e., the Continuing Guaranty. They say nothing about damages that may result from the breach of an implied warranty under the Boxed Beef contract.

¶ 31. Therefore, although the two principles— exclusion or modification of implied warranties and limitation of remedies—have different effects on contracts, any difference in application of these principles does not help Excel here because the language of the Continuing Guaranty does not extend beyond the warranties given in the Guaranty itself. Therefore, even if, arguendo, we were to construe the provision limiting consequential damages as a limitation of remedies, the provision of the Guaranty applies exclusively to the Continuing Guaranty. Consequently, the warranties implied under the Boxed Beef contract, and the remedies available for breach thereof, are unaffected by the Continuing Guaranty.[12]

---

[12] Excel relies heavily on *Wyatt Industries, Inc. v. Publicker Industries, Inc.*, 420 F.2d 454 (5th Cir. 1969), to support its argument that the Continuing Guaranty's language need not explicitly refer to implied warranties to limit the remedies for breach of such warranties. *Id.* at 456–57. We do not question the underlying proposition that parties may alter the remedies available under their contracts. *See* Wis. Stat. § 402.719(1)(a). However, the contract at issue in *Wyatt* stated that the merchandise was to be shipped "as is" and that, in any event, the seller's liability was not to exceed $25,000. *See Wyatt,* 420 F.2d at 456. Therefore, the contract in *Wyatt* used UCC-approved language to disclaim implied warranties and explicitly limited the remedies available "for any damage claims or repair costs occurring in connection with" the merchandise. *See id.* By contrast, the language of the Continuing Guaranty does not state that Excel's meat was to be shipped "as is," nor did the

¶ 32. We, therefore, conclude that the language used in the Continuing Guaranty had the precise effect of barring Sizzler's recovery of incidental and consequential damages for breach of those express warranties contained in the Guaranty; however, the Continuing Guaranty's limitation of remedies simply cannot be construed to extend to the Boxed Beef contract.[13] We will not depart from the language of the contract, nor read language into a contract, when the language that the parties employed plainly states their intentions. *See Dykstra v. Arthur G. McKee & Co.*, 92 Wis. 2d 17, 38, 284 N.W.2d 692 (Ct. App. 1979). Therefore, we agree with the reasoning and conclusion of the court of appeals. The Continuing Guaranty lacks the requisite specificity to exclude or modify the implied warranties of Wis. Stat. ch. 402 in the Boxed Beef contract.

## C. Indemnification, Contribution and Subrogation

¶ 33. Three of the claims presented involve the application of equitable or contractual indemnification, as well as consideration of contribution and subrogation principles.

---

terms of the Continuing Guaranty suggest that the Continuing Guaranty would apply to other aspects of the parties' agreements, such as the Boxed Beef contract. Accordingly, *Wyatt* is inapplicable.

[13] Because we conclude that the Continuing Guaranty neither disclaimed implied warranties under the Boxed Beef contract nor limited remedies for breach of any warranties under the Boxed Beef contract, we do not reach Sizzler's counterarguments that such a limited remedy as replacement value would have failed of its essential purpose or that Sizzler would have been left without a minimum quantum of remedies.

¶ 34. Indemnification can arise by contract or it can be based on equitable principles. *Greenlee v. Rainbow Auction/Realty Co., Inc.*, 218 Wis. 2d 745, 754 n.4, 582 N.W.2d 93 (Ct. App. 1998). Contractual indemnification assigns the risk for a potential loss as part of the bargain of the parties. *See Deminsky v. Arlington Plastics Mach.*, 2003 WI 15, ¶ 22, 259 Wis. 2d 587, 657 N.W.2d 411. Equitable indemnification seeks to shift the burden of payment to the party who, in equity, should pay. *See* 1 Dan B. Dobbs, *Dobbs Law of Remedies: Damages, Equity, Restitution* § 4.3(4) (2d ed. 1993); 63B Am. Jur. 2d, *Products Liability* § 1879 (2012). Equitable indemnification "shifts the entire loss from one person who has been compelled to pay it to another who, on the basis of equitable principles, should bear the loss." *Swanigan v. State Farm Ins. Co.*, 99 Wis. 2d 179, 196, 299 N.W.2d 234 (1980).

¶ 35. No shared liability for the debt is required to support indemnification. *See id.*; *Perkins v. Worzala*, 31 Wis. 2d 634, 637, 143 N.W.2d 516 (1966). Contribution, on the other hand, requires the discharge of a common liability, and "distributes the loss by requiring each person to pay his proportionate share of the damages on a comparative fault basis." *Swanigan*, 99 Wis. 2d at 196. The right to receive either indemnification or contribution requires a party seeking payment to prove it has made a payment, part or all of which the party seeks to recover. *See State Farm Mut. Auto. Ins. Co. v. Cont'l Cas. Co.*, 264 Wis. 493, 497, 59 N.W.2d 425 (1953) (holding that the right of contribution "ripens into a cause of action upon payment by reason of a judgment, or pursuant to a reasonable settlement made with the injured"); *Brown v. LaChance*, 165 Wis. 2d 52, 64, 477 N.W.2d 296

(Ct. App. 1991) (recognizing that one element of the right to indemnification is payment by the party seeking the remedy).

¶ 36. Contribution claims ripen when more than one party is responsible for the loss a third party has sustained and one of those responsible has paid more than that party's share. *See Day v. Allstate Indemn. Co.*, 2011 WI 24, ¶ 44, 332 Wis. 2d 571, 798 N.W.2d 199. Contribution permits the loss to be allocated among the responsible parties based on each party's proportionate responsibility for the loss. *See id.*

¶ 37. Subrogation is akin to indemnification in that it seeks to recoup the total payment that the party seeking subrogation has made. *Steffens*, 335 Wis. 2d 514, ¶ 36. Subrogation rights may arise in three ways:

> (1) contractual subrogation, *Millers National Insurance Co. v. City of Milwaukee*, 184 Wis. 2d 155, 167, 516 N.W.2d 376 (1994); (2) statutory subrogation, *Ellsworth v. Schelbrock*, 2000 WI 63, ¶ 19, 235 Wis. 2d 678, 611 N.W.2d 764; and (3) equitable subrogation, *Berna-Mork v. Jones*, 174 Wis. 2d 645, 652–53, 498 N.W.2d 221 (1993).

*Id.*, ¶ 37.

¶ 38. Here, E&B seeks to exercise Federal Insurance's right to subrogation for the $1 million payment Federal Insurance made on E&B's behalf. In so doing, E&B is attempting to exercise its contractual rights under the Hold Harmless Agreement as though it had made the payment that Federal Insurance made. Keeping in mind the principles of law explained above, we move to three of the claims presented for our review.

## 1. Sizzler's claim for equitable indemnification

¶ 39. Sizzler seeks equitable indemnification from Excel for its pre-settlement payment of $1.5 million to the Kriefall family. Sizzler made this payment under an agreement entitled an "Advance Partial Payment Pursuant to Sec. 885.285 Wis. Stats." Approximately $1 million of this payment was funded by Sizzler's insurer, Secura, who has retained its contractual rights of subrogation as to payments made on Sizzler's behalf. The advance partial payment of $1.5 million was included in the figure that Sizzler urged the jury to award as out-of-pocket expenses; however, the jury declined to do so. Instead, the jury awarded $311,000, which was the remainder after subtracting $1.5 million from approximately $1.8 million that Sizzler sought as its total out-of-pocket expenses. After the jury's verdict, Sizzler brought a post-verdict motion to recover the $1.5 million under a theory of equitable indemnification.

¶ 40. The circuit court concluded that, "the law does not allow for [Sizzler's] recovery of the $1.5 million as equitable indemnity." However, the court of appeals reversed the circuit court's denial of equitable relief, reasoning that Sizzler's payment to the Kriefalls was sufficiently involuntary to satisfy the requirement that a party seeking equitable indemnification must not have voluntarily paid the sum that it now seeks to recover. *See Kriefall II*, 335 Wis. 2d 151, ¶ 81. We agree with the conclusion of the court of appeals.

■■

¶ 41. Equitable indemnity is possible when one party is exposed to liability for the wrongful acts of another. In order to be eligible for equitable indemnification for the $1.5 million payment Sizzler paid to the

Kriefall family, Sizzler must show that it "in whole or in part, has discharged a duty which is owed by [Sizzler] but which as between [Sizzler] and another should have been discharged by the other." *Kjellsen v. Stonecrest, Inc.*, 47 Wis. 2d 8, 11–12, 176 N.W.2d 321 (1970). The discharge-of-a-duty requirement ensures that a party who voluntarily pays the obligation of another will not be equitably indemnified. *See Milwaukee Mut. Ins. Co. v. Priewe*, 118 Wis. 2d 318, 322–23, 348 N.W.2d 585 (Ct. App. 1984).

■

¶ 42. Potential liability will defeat the conclusion that a payment was voluntary. *Kennedy-Ingalls Corp. v. Meissner*, 5 Wis. 2d 100, 106–07, 92 N.W.2d 247 (1958). In *Kennedy-Ingalls*, we considered a subrogation claim in circumstances similar to those for which Sizzler seeks indemnification. We held that an alleged joint tort-feasor's payment to a plaintiff as part of a settlement was not voluntary. *Id.* We so held because prior to the adjudication of fault, a payor's actions are colored by the potential for liability. *See id.* In *Kennedy-Ingalls*, we explained that "one who pays the liability of another in response to the threat of civil suit is not a volunteer if the payor acted to avoid trouble and expense." *Id.* (citing Restatement (First) of Restitution § 71(2) (1937)); *see also Voge v. Anderson*, 181 Wis. 2d 726, 731, 512 N.W.2d 749 (1994); *Perkins*, 31 Wis. 2d at 637–38.

■

¶ 43. Furthermore, although a contractual obliga-tion may demonstrate a lack of voluntariness, a party seeking equitable indemnification need not show a con-tractual relationship with the party from whom equi-table indemnification is sought. *See Kjellsen*, 47 Wis. 2d at 11–12. Rather, a party seeking indemnification must show that the obligation to pay should be shifted to one

who in equity should bear the loss. *See id.*; *Swanigan*, 99 Wis. 2d at 196. Here, the circumstance that gave rise to Sizzler's claim of equitable indemnification from Excel was Sizzler's exposure to liability for Excel's delivery of contaminated meat, an act that Sizzler did not join. *See Kjellsen*, 47 Wis. 2d at 11–12.

¶ 44. Based on the circumstance herein presented and controlling legal principles, we conclude that Sizzler's payments to the Kriefalls were not made voluntarily. First, at the time of the payments, Sizzler was a named defendant in the Kriefalls' lawsuit, which alleged that the plaintiffs had suffered substantial injuries at a Sizzler restaurant. Second, no apportionment of fault had yet been made, and at the time of Sizzler's payment, Excel denied any liability for the E. coli contamination. Therefore, the specter of potential liability hung heavy over Sizzler at the time of its payment to the Kriefall family.

¶ 45. Moreover, the jury's allocation of fault demonstrates that the considerations necessary to invoke equitable indemnification are present. As between Excel and Sizzler, who was found not liable, Sizzler's payment, if unreimbursed, would benefit the tortfeasor, Excel. *See Brown*, 165 Wis. 2d at 64–65. Sizzler made a payment in contemplation of potential liability for injuries, for which Sizzler was later determined to have no responsibility. We agree with the court of appeals that the circuit court erroneously exercised its discretion when it failed to apply the relevant principles of law to Sizzler's claim for equitable indemnification.

¶ 46. We further conclude that, as between Excel and Sizzler, no persuasive argument has been made that Sizzler should be equitably indemnified for only 80 percent of the payment it made to the Kriefall family, as

Excel urges. Excel argues that because it was determined to be only 80 percent liable, it should not be required to pay Sizzler for the full amount, suggesting that Sizzler's claim for indemnification should be partially satisfied by E&B.

¶ 47. However, Excel's argument ignores the purpose of equitable indemnification, which is to shift the entire obligation to pay from one who has paid to another who, in equity, should be held liable. *See Kjellsen*, 47 Wis. 2d at 11–12. We offer no opinion about Excel's seeking equitable relief from E&B. That question is not before us. However, as between Excel and Sizzler, equity entitles Sizzler to shift the entire burden of its payment to the Kriefalls to Excel.

### 2. E&B's contractual indemnification claim

¶ 48. In response to the 138 individual, non-Kriefall plaintiffs' claims raised against E&B and others, E&B attempted to tender its defense to Excel multiple times under the parties' Hold Harmless Agreement.[14] The Hold Harmless Agreement provides in relevant part:

> [Excel] agrees to defend, indemnify and hold harmless Buyer and its . . . customers (individually, an "Indemnitee") from all actions, suits, claims and proceedings ("Claims"), and any judgments, damages, fines, costs and expenses (including reasonable attorneys' fees) resulting therefrom:

[14] The Hold Harmless Agreement is between Sysco Corporation (who is termed the Buyer) and Excel, but the agreement also encompasses Sysco's customers. There is no dispute that E&B is Sysco's customer and, therefore, is an indemnitee under the agreement.

. . . .

(ii) brought or commenced by any person or entity against any Indemnitee for the recovery of damages for the injury, illness and/or death of any person or damage to property arising out of or alleged to have arisen out of (a) the delivery, sale, resale, labeling, use or consumption of any Product, or (b) the negligent acts or omissions of [Excel]; provided, however, that [Excel's] indemnification obligations hereunder shall not apply to the extent that Claims are caused by the negligent acts or omissions of Buyer or any other third party.

Indemnitee shall notify [Excel] promptly of the service of process or the receipt of actual notice of any Claim.

¶ 49. Excel repeatedly refused to accept E&B's tenders of the claims made against E&B. Instead, Excel denied any liability for the E. coli contaminated meat it sold. Facing claims of more than $10 million for the non-Kriefall plaintiffs, E&B sought to settle with those claimants.

¶ 50. By mid-2001, Federal Insurance, one of E&B's insurers, accepted E&B's tender, and Federal Insurance and E&B met with representatives from Secura, another of E&B's insurers, to discuss settlement of the non-Kriefall claims. The Federal Insurance policy covering E&B included a clause granting Federal Insurance a right of subrogation to any rights of recovery that E&B may have. That clause provided:

If the insured has rights to recover all or part of any payment we have made under this insurance, those rights are transferred to us. The insured must do nothing after loss to impair them. At our request, the insured will bring suit or transfer those rights to us and help us enforce them.

60

¶ 51. In regard to settlement with the non-Kriefall plaintiffs, E&B, with its insurers Federal Insurance and Secura, entered into *Pierringer* releases with the 138 non-Kriefall plaintiffs for approximately $3.5 million. Federal Insurance provided $1 million toward the settlement of the non-Kriefall claims, and Secura provided $2.5 million.

¶ 52. Excel claims that the use of *Pierringer* releases precludes E&B's claims for indemnification, based on the theory that the releases adjudicated E&B's individual liability as to the non-Kriefall plaintiffs, and that the Hold Harmless Agreement prevents E&B from obtaining indemnification for E&B's own negligent acts. The court of appeals and the circuit court concluded that the two obligations—those that E&B assumed under the *Pierringer* releases and those that Excel contracted for in the Hold Harmless Agreement—are entirely separate obligations, one arising in tort and the other in contract. Therefore, E&B did not surrender its rights under the Hold Harmless Agreement when it entered into the *Pierringer* releases. We agree.

¶ 53. In support of its position, Excel urges us to apply the rationale of *Unigard Ins. Co. v. Ins. Co. of N. Am.*, 184 Wis. 2d 78, 516 N.W.2d 762 (Ct. App. 1994), in which the court of appeals held that after entering into a *Pierringer* release, a joint tortfeasor was barred from seeking contribution from another tortfeasor. *Id.* at 85–87. The court distinguished the *Pierringer*-type release from general releases and covenants not to sue, noting that the latter two mechanisms preserve a settling joint tortfeasor's right to recover from its co-tortfeasors, whereas the hallmark of the *Pierringer* release is its final determination of the released party's tort liabilities as to both the plaintiff and any other co-tortfeasors. *Id.*

¶ 54. In contrast, E&B relies on *Eden Stone Co., Inc. v. Oakfield Stone Co., Inc.*, 166 Wis. 2d 105, 479 N.W.2d 557 (Ct. App. 1991), to support its argument that the principles of *Pierringer* are simply inapplicable here because Excel and E&B had a separate contractual relationship. In *Eden Stone*, the court of appeals distinguished between obligations arising under contract and those that arise under tort law. *See id.* at 119–20. The court stated that Eden Stone's release of its contract claims against one party, the Schraufnagels, using *Pierringer*-type language, did not bar Eden Stone's subsequent tort claims against another party, Oakfield Stone. *See id.* In so concluding, the *Eden Stone* decision noted that "*Pierringer* law has never extended or recognized the use of such releases where one defendant is sued in contract and another in tort." *Id.* at 120.

¶ 55. Although we agree with *Eden Stone*'s distinction between tort and contract obligations, neither *Eden Stone* nor *Unigard* is directly on point. In *Eden Stone*, the court relied on the contractual nature of the released claims, and concluded therefore, that the principles of *Pierringer* were inapplicable in the subsequent tort action. *Id.* at 119–20. Here, however, the situation is the reverse of that presented in *Eden Stone*, in that E&B used *Pierringer* releases to settle traditional tort claims with the non-Kriefall plaintiffs and now seeks to recover from Excel under E&B and Excel's independent contractual agreement.

¶ 56. *Unigard* also fails to provide an answer because *Unigard* did not involve a separate, contractual relationship between the joint tortfeasors; the only obligations at issue were the parties' respective shares of tort liability to the plaintiff. *See Unigard*, 184 Wis. 2d at 81–82. In the case before us, there was a preexisting contractual relationship between Excel and E&B, the

Hold Harmless Agreement, and it is the indemnification obligations under that agreement that are at issue here.

¶ 57. Our decision turns in part on the nature of the relief E&B seeks. Excel argues that E&B's claim is based on contribution, but that E&B waived any right to contribution by entering into the *Pierringer* releases. E&B disagrees and focuses on the separate contractual rights of defense and indemnification under the Hold Harmless Agreement. E&B asserts that its contractual rights were not relinquished by the *Pierringer* releases.

¶ 58. Contribution involves apportionment of liability where two or more parties share liability for the same injury. *See Swanigan*, 99 Wis. 2d at 196. However, E&B's claim here is not based on contribution or a shared liability, but rather on Excel's breach of the Hold Harmless Agreement, by which Excel promised to defend and indemnify E&B against claims such as those asserted by the non-Kriefall plaintiffs. The only limitation on Excel's obligation under the Hold Harmless Agreement in regard to indemnification is "the extent" to which the claims asserted against E&B were caused by the "negligent acts or omissions" of E&B. In addition, there is no stated limit on Excel's duty to defend E&B under the Hold Harmless Agreement.

¶ 59. When discussing an alleged breach of the duty to defend under an indemnification agreement, we have noted that an indemnitor's duty to defend does not depend on the merits of the claim asserted. *Elliott v. Donahue*, 169 Wis. 2d 310, 321, 485 N.W.2d 403 (1992). Instead, the duty to defend arises when potential liability is asserted against the indemnitee. *Barrons v. J.H. Findorff & Sons, Inc.*, 89 Wis. 2d 444, 455, 278 N.W.2d 827 (1979). Indemnitors who deny their responsibility

after tender of a potential suit or liability "cannot subsequently be allowed to turn around and evade the consequences which their own conduct and negligence have superinduced." *Deminsky*, 259 Wis. 2d 587, ¶ 40 (quoting *Ill. Cent. R.R. Co. v. Blaha*, 3 Wis. 2d 638, 644, 89 N.W.2d 197 (1958)) (internal quotation marks omitted).

¶ 60. Excel's conduct showed that it ignored its duty to defend, as well as its duty to indemnify under the Hold Harmless Agreement. The Hold Harmless Agreement explicitly states that Excel promised to defend E&B "from all actions, suits, claims and proceedings." Accordingly, regardless of E&B's ultimate liability, Excel was obligated to honor its duty to defend upon E&B's tender of a claim against it for acts or omissions that were arguably within the purview of the Hold Harmless Agreement.

¶ 61. E&B tendered its defense of the claims arising from the E. coli contaminated meat to Excel numerous times, beginning as early as August 14, 2000, just weeks after the illnesses first surfaced. Over the following years, Excel continued to refuse to defend E&B and asserted that, because of E&B's alleged negligence, Excel had no obligations under the Hold Harmless Agreement.

¶ 62. In refusing E&B's tenders, Excel breached its duty to defend under the Hold Harmless Agreement. E&B then brought a claim against Excel for those damages which naturally flowed from Excel's breach. *See Newhouse v. Citizens Sec. Mut. Ins. Co.*, 176 Wis. 2d 824, 837, 501 N.W.2d 1 (1993). The damage sustained is the $3.5 million that E&B was forced to pay to the non-Kriefall plaintiffs under the *Pierringer*-type releases for settlement of the tort claims against it, *see id.* at 837–38, unless those damages were unreasonable. Excel does not

assert that the amounts paid in settlement of the non-Kriefall plaintiffs' claims were unreasonable. Furthermore, had Excel properly honored its duty to defend, E&B would not have been forced to undertake the settlement negotiations and to incur damages as a result of the settlement.

¶ 63. E&B's recovery for Excel's breach of contract is controlled by the jury's apportionment of liability and the terms of the Hold Harmless Agreement. E&B's entry into *Pierringer* releases with the non-Kriefall plaintiffs is not relevant to Excel's contractual obligations to E&B. The jury determined that Excel's portion of the liability for injuries caused by the E. coli contamination of food was 80 percent and that E&B should shoulder 20 percent of the liability. The Hold Harmless Agreement set a limit on Excel's obligation to indemnify as follows: "[Excel's] indemnification obligations hereunder shall not apply *to the extent* that Claims are caused by the negligent acts or omissions of Buyer or any other third party." (Emphasis added.) Here, Excel's conduct was not the sole cause of the injuries that arose from the contaminated meat it sold; the jury determined that E&B was 20 percent liable. Accordingly, we conclude that E&B may recover 80 percent of the $3.5 million E&B paid in settlement of the claims of the non-Kriefall plaintiffs, subject to the reduction explained in Section C.3. below, because that amount takes into account the extent of E&B's negligent acts or omissions, as the Hold Harmless Agreement requires.

### 3. Indemnification reduction

¶ 64. After the non-Kriefall claims had been settled, Federal Insurance sought dismissal based on a

"pay and walk" provision in its policy that covered E&B. Notable for our present inquiry, Federal Insurance did not pursue a subrogation claim for its $1 million payment to the non-Kriefall plaintiffs.[15] Federal Insurance was subsequently dismissed from the consolidated E. coli cases.

¶ 65. The circuit court initially concluded that E&B and its insurers were entitled to recover approximately $2.8 million (or 80 percent) of the $3.5 million that Secura and Federal Insurance had paid to settle the non-Kriefall claims. Excel then sought to have its obligation reduced by 80 percent of the $1 million that Federal Insurance had paid because Federal Insurance waived its subrogation rights. The circuit court rejected Excel's arguments and held that E&B was entitled to recover $800,000 (80 percent) of Federal Insurance's $1 million payment, and that Excel also was required to reimburse Secura $2 million of the approximately $2.5 million that Secura had contributed to the non-Kriefall settlements. Excel appealed the circuit court's award of $800,000 in favor of E&B. The court of appeals reversed, concluding that there was nothing in the Hold Harmless Agreement justifying that result, and that the collateral source rule did not apply. *Kriefall II*, 335 Wis. 2d 151, ¶¶ 35–36.

¶ 66. Before us, E&B asserts that under the Hold Harmless Agreement, Excel was required to indemnify E&B for the $1 million Federal Insurance paid to the non-Kriefall plaintiffs on E&B's behalf. E&B reasons that because Federal Insurance waived its right of subrogation to E&B's contractual right of indemnifica-

---

[15] There has been no assertion before us that E&B's other insurer, Secura, has not maintained its contractual subrogation rights throughout this litigation.

tion under the Hold Harmless Agreement, that right reverted to E&B. E&B also argues that the collateral source rule supports the result it seeks because Excel, the tortfeasor more responsible for the injuries sustained, will receive a windfall if Excel is not required to make payment to E&B for the amounts Federal Insurance paid on E&B's behalf. We address each contention in turn.

■■■■■

¶ 67. As a general principle, indemnification is often closely tied to the theory of subrogation. As we stated in *Perkins*, 31 Wis. 2d at 637, "subrogation gives indemnity." Subrogation, as with indemnification, seeks to recoup the total payment that a party seeking subrogation has made. *Steffens*, 335 Wis. 2d 514, ¶ 36. Upon payment, the person who made the payment stands in the shoes of the person for whom payment was made. *Orlowski v. State Farm Mut. Auto. Ins. Co.*, 2012 WI 21, ¶ 17, 339 Wis. 2d 1, 810 N.W.2d 775. Both indemnification and subrogation require that a person seeking to recover under either theory has made payment. *See Teacher Ret. Sys. of Tex. v. Badger XVI Ltd. P'ship*, 205 Wis. 2d 532, 547, 556 N.W.2d 415 (Ct. App. 1996); *Steffens*, 335 Wis. 2d 514, ¶ 36. The right to subrogation, whether established by contract or by equity, may be waived by the payor who chooses not to pursue its right to recoup the payment made. *See Voge*, 181 Wis. 2d at 731–32.

■■■

¶ 68. The Hold Harmless Agreement says nothing about subrogation or what would occur if a party to whom indemnification is owed satisfied an obligation to a third party by having an insurance company make the third-party payment. The Hold Harmless Agreement also does not define indemnification such that the usual

understanding of that term is changed for purposes of the agreement. Instead, indemnification under the Hold Harmless Agreement is linked to "judgments, damages, fines, costs and expenses" that result from "actions, suits, claims and proceedings" covered by the agreement. However, E&B made no payment in satisfaction of a judgment, or as damages, fines, costs or expenses. Furthermore, E&B does not argue that it has an assignment of Federal Insurance's subrogation rights. Accordingly, E&B has no contractual right to be indemnified for the $1 million payment that Federal Insurance made.

¶ 69. We next consider the collateral source rule. The collateral source rule is an equitable doctrine that provides that where a plaintiff is injured by the tortious conduct of another, the injured plaintiff's recovery will not be reduced by payments the plaintiff receives from other sources. *Orlowski*, 339 Wis. 2d 1, ¶¶ 18, 26 (holding that where plaintiff was injured by negligence of another, collateral source rule prohibits decreasing plaintiff's recovery from her own underinsured motorist carrier for medical expenses written off by medical provider). The collateral source rule causes the tortfeasor to fully shoulder the damages his conduct has caused, even when doing so provides a windfall to an injured plaintiff. *Id.*, ¶ 18.

¶ 70. The collateral source rule has never been applied to benefit a tortfeasor, and the policies that underlie the collateral source rule support its use to benefit only injured plaintiffs. E&B is a tortfeasor, as is Excel. Neither one is an injured plaintiff whose damages have been supplemented by payments received from one who is not a tortfeasor. While we are cognizant

of the equitable argument that E&B makes because its fault was 20 percent and Excel's was 80 percent, requiring Excel to pay E&B $800,000 that E&B never paid would create a windfall for a tortfeasor and not a windfall for an injured plaintiff.

## D. Attorney Fees

¶ 71. Sizzler also seeks to recover attorney fees that it incurred defending against the claims that arose due to Excel's sale of meat containing E. coli. Sizzler asserts that it is an innocent party and that Excel's distribution of tainted meat constituted wrongful conduct that entitles Sizzler to attorney fees under the narrow exception to the "American Rule" stated in *Weinhagen*, 179 Wis. at 63–66. We disagree.

¶ 72. The American Rule provides that parties to litigation typically are responsible for their own attorney fees. *See Fleischmann Distilling Corp. v. Maier Brewing Co.*, 386 U.S. 714, 717–18 (1967). Limited exceptions do exist, such as where statutes provide for the recovery of attorney fees for prevailing parties, or where the parties contract for the award of attorney fees. *See Meas v. Young*, 142 Wis. 2d 95, 101, 417 N.W.2d 55 (Ct. App. 1987). In addition, we have developed a narrow exception to the American Rule, as we explained in *Weinhagen*.

¶ 73. In *Weinhagen*, 179 Wis. at 63–66, we reaffirmed the American Rule, but held that an innocent party, wrongfully drawn into litigation with a third party, may recover those fees reasonably incurred in defending against such action.

> The general rule is that costs and expenses of litigation, other than the usual and ordinary court

costs, are not recoverable in an action for damages, nor are such costs even recoverable in a subsequent action; but, where the wrongful acts of the defendant have involved the plaintiff in litigation with others, or placed him in such relation with others as to make it necessary to incur expense to protect his interest, such costs and expense should be treated as the legal consequences of the original wrongful act.

*Id.* at 65 (quoting *McGaw v. Acker, Merrall & Condit Co.*, 73 A. 731, 734 (Md. 1909)).

¶ 74. Subsequently, *Weinhagen* has been interpreted to require that: (1) the party from whom fees are sought must have committed a wrongful act against the party seeking attorney fees; and (2) the commission of such wrongful act forced the party seeking fees into litigation with a third party, or required the party seeking attorney fees to incur expenses protecting that party's interests against claims arising from the wrongful act. *See Meas*, 142 Wis. 2d at 102–04.

¶ 75. The first element, the wrongful act requirement, has been found to be satisfied upon a showing of a breach of a fiduciary duty or a fraud perpetrated on the party seeking fees, by the party from whom attorney fees are sought. *See id.* In *Weinhagen*, the award of attorney fees was driven by a finding that the contract giving rise to the action was based on fraud, *see Weinhagen*, 179 Wis. at 63; and in *Meas*, 142 Wis. 2d at 102–04, attorney fees were allowed where the sellers were drawn into litigation with the buyers solely because of the wrongful acts by the realtors against their clients, the sellers. The court in *Meas* concluded that the realtors' actions constituted a breach of their fiduciary duties to the sellers, and on that basis held that the first element of the *Weinhagen* exception was satisfied. *See id.*

70

¶ 76. Accordingly, the *Weinhagen* exception's wrongful act requirement demands more than an allegation of mere negligence that has involved a party in litigation; instead, "wrongfulness" requires something similar to fraud or breach of a fiduciary duty to the party seeking attorney fees.[16]

¶ 77. Although we do not expressly limit the wrongful act in the *Weinhagen* exception to a showing of fraud or breach of fiduciary duty, such application is instructive. Allowing recovery upon an allegation of mere negligence would contravene the American Rule, which is intended to preserve access to justice without fear that a litigant will be liable for her opponent's attorney fees if she loses. *See Weinhagen*, 179 Wis. at 66.

> To hold otherwise would be to open the door to oppression and extortion, to penalize persons who appeal to the courts to adjudicate their differences. It would not be in accord with sound public policy. The temptation to institute litigation for the purpose of recovering from the opposite party generous fees would be very great and no doubt lead to great abuses.

*Id.*

¶ 78. Furthermore, we conclude that Sizzler's reliance on *Fidelity & Deposit Co. of Maryland v. Krebs Engineers*, 859 F.2d 501, 505–07 (7th Cir. 1988), is misplaced. *Fidelity* involved a claim for attorney fees pursuant to Wis. Stat. § 402.715, in a breach of contract suit where the contract did not address attorney fees. *Id.* at 504–05. *Fidelity* relied on our holding in *Murray*.

---

[16] *But see Gorton v. Hostak, Henzl & Bichler, S.C.*, 217 Wis. 2d 493, 512, 577 N.W.2d 617 (1998) (explaining that breach of fiduciary duty may not always be sufficient to support an award of attorney fees).

In *Murray*, we declined to allow an award of attorney fees under § 402.715. We noted that other courts that have considered this question under provisions similar to Wis. Stat. § 402.715 have held that no award of attorney fees as consequential damages is proper when the contract at issue does not address attorney fees. *See Murray*, 83 Wis. 2d at 434–36. We nonetheless noted that attorney fees incurred in third-party litigation may be recovered where they arise from the defendant's breach of contract or wrongful act that caused the plaintiff to be sued by a third-party. *Id.* at 435 n.11. Although *Fidelity*, on which Sizzler relies, can be read as having gone beyond our holding in *Murray*, to that extent, *Fidelity* is not grounded in Wisconsin law. Wisconsin law employs the *Weinhagen* test, as explained above.

¶ 79. Here, although there were contracts between Excel and Sizzler, the third-party litigation that Sizzler was forced to defend cannot be said to have arisen from the parties' contractual relationship alone. The plaintiffs' claims here were based primarily in tort law. Sizzler's involvement arose because of Sizzler's potential liability for the alleged breach of a claimed duty of due care. Therefore, we conclude that Sizzler has not met the *Weinhagen* test of what constitutes a wrongful act by the party from whom attorney fees are sought.

¶ 80. Accordingly, we conclude that Sizzler has not stated a claim for attorney fees under the *Weinhagen* exception to the American Rule because Sizzler has not demonstrated that Excel engaged in wrongful conduct as to Sizzler. Sizzler's role in this litigation began as a party potentially liable for the claims of the plaintiffs who were injured by the E. coli contaminated meat Excel sold in Sizzler's franchised restaurants. Sizzler was not an unrelated, third party, notwithstanding the jury's ultimate

72

apportionment of fault. Therefore, Sizzler may not look to Excel or any other party to recover the attorney fees that Sizzler incurred defending against the plaintiffs' tort claims in these consolidated cases.

## III. CONCLUSION

¶ 81. We affirm the decision of the court of appeals on all five issues presented. First, we hold that Sizzler is entitled to recover consequential damages for Excel's breach of implied warranties in the parties' meat supply contract, notwithstanding limiting language in the Continuing Guaranty. Second, Sizzler also is entitled to indemnity from Excel for the entirety of Sizzler's $1.5 million advance partial payment to the Kriefall family because the payment was not voluntary and the jury found that Sizzler was zero percent liable for the E. coli contamination. Third, pursuant to the Hold Harmless Agreement, Excel is required to indemnify E&B for payments E&B made to certain non-Kriefall plaintiffs in exchange for *Pierringer* releases; however, Excel's obligation extends only so far as its apportioned liability, which is 80 percent. Fourth, Excel is not required to indemnify E&B for payments that Federal Insurance made on E&B's behalf in settling the non-Kriefall plaintiffs' claims. Fifth, and finally, notwithstanding the jury's determination that Sizzler was zero percent responsible for the E. coli contaminated food that caused the illnesses of so many people, Sizzler may not recover attorney fees from Excel because the exception to the American Rule stated in *Weinhagen* does not apply.

¶ 82. *By the Court.*—The decision of the court of appeals is affirmed.

¶ 83. SHIRLEY S. ABRAHAMSON, C.J. (*concurring in part and dissenting in part*). I agree with most

of the majority's conclusions. I part ways with the majority on the "Indemnification Reduction" issue (issue number four). Majority op., ¶¶ 2, 64–70.

¶ 84. This appeal presents a number of challenging issues, both factually and legally. A glance at the parties' briefs might suggest that the indemnification reduction issue is the most complex issue of the bunch. But the issue, properly analyzed, turns out to be a relatively simple matter of contract interpretation.

¶ 85. The contract in question is the "Hold Harmless Agreement." According to the text of the Agreement, Excel promised to "defend, indemnify and hold harmless" E&B "from all actions, suits, claims and proceedings ("Claims"), and any judgments, damages, fines, costs and expenses . . . resulting therefrom."[1]

¶ 86. E&B was sued by a number of plaintiffs, including the "non-Kriefall plaintiffs." Their claims arose from Excel's meat products.

¶ 87. The majority concludes that Excel breached its duty to defend under the agreement, leaving E&B to negotiate a settlement with the non-Kriefall plaintiffs without Excel's assistance. Majority op., ¶ 62. As the majority explains, E&B's claim against Excel is based "on Excel's breach of the Hold Harmless Agreement, by which Excel promised to defend and indemnify E&B against claims such as those asserted by the non-Kriefall plaintiffs." Majority op., ¶ 58.

¶ 88. The Hold Harmless Agreement covered claims against E&B arising from Excel's meat products.

---

[1] The first place to look when analyzing a contract is to the language of the contract itself, as "the best indication of the parties' intent is the language of the contract itself, for that is the language the parties 'saw fit to use.' " *Town Bank v. City Real Estate Dev., LLC*, 2010 WI 134, ¶ 33, 330 Wis. 2d 340, 793 N.W.2d 476 (citations omitted).

According to the majority opinion, "*[t]he only limitation* on Excel's obligation under the Hold Harmless Agreement in regard to indemnification is 'the extent' to which the claims asserted against E&B were caused by the 'negligent acts or omissions' of E&B." Majority op., ¶ 58 (emphasis added). *See also* majority op., ¶¶ 12, 48.

¶ 89. I agree with the majority that E&B is entitled to recover from Excel only 80% of the settlement under the Agreement because the jury apportioned 20% of the causal negligence to E&B.

¶ 90. E&B settled with the non-Kriefall plaintiffs for payment in the sum of $3.5 million. Crucially, $2.5 million of the settlement was funded by one insurer (Secura) and the remaining $1 million was funded by another (Federal Insurance). Both insurance policies gave the insurers subrogation rights, meaning that if the insurance company paid a claim and the insured (E&B here) had the right to recover the money from another entity (Excel here), the insurance company could stand in E&B's shoes and assert E&B's right to recover funds.

¶ 91. Secura joined the present lawsuit, which was to assign ultimate responsibility among a number of actors for payment of the $3.5 million settlement and other settlements that are not relevant to the indemnification reduction issue. Secura seeks to stand in E&B's shoes and assert E&B's right against Excel to the $2.5 million Secura contributed. Federal Insurance, on the other hand, is not a party in the present lawsuit and does not intend to exercise its subrogation rights against Excel. Issue four, the indemnification reduction issue, focuses on whether Excel must indemnify E&B for the $1 million that Federal Insurance paid to the non-Kriefall plaintiffs on E&B's behalf.

¶ 92. Nothing in the Hold Harmless Agreement addresses subrogation. Despite having emphasized that

the *only limitation* on Excel's contractual indemnification duties is the extent to which E&B's negligence caused the claims, the majority reads into the Hold Harmless Agreement another limitation on Excel's obligation to indemnify E&B. The majority concludes that Excel is not obligated to indemnify E&B for the $1 million provided by Federal Insurance because Federal Insurance is not exercising its subrogation rights. Majority op., ¶¶ 64–68.

¶ 93. According to the majority, because Federal is not exercising its subrogation rights, "E&B made no payment in satisfaction of a judgment, or as damages, fines, costs or expenses. . . . Accordingly E&B has no contractual right to be indemnified for the $1 million payment that Federal Insurance made." Majority op., ¶ 68. I disagree with the majority's analysis and conclusion.

¶ 94. E&B was liable to satisfy the settlement. It was *E&B,* not E&B's insurers, who entered into a settlement with the non-Kriefall plaintiffs. As the majority explains, "*E&B* was forced to pay [$3.5 million] to the non-Kriefall plaintiffs . . . for settlement of the tort claims *against it* . . . ." Majority op., ¶ 62 (emphases added).

¶ 95. The Hold Harmless Agreement provides that Excel would indemnify E&B from "*all* actions, suits, claims, and proceedings" . . . from "*any* judgments, damages, fines, costs and expenses" (emphases added). The $3.5 million settlement, including Federal Insurance's $1 million dollar payment on behalf of E&B, falls directly within the text and reach of the Agreement.

¶ 96. Nothing in the Hold Harmless Agreement turns on whether E&B personally made payment from its resources to settle the claims against it or whether another entity made payment on behalf of E&B. Pur-

suant to the Hold Harmless Agreement, Excel is contractually obligated to indemnify E&B from any claims against E&B and any judgments and expenses that result from those claims.

¶ 97. Thus, when E&B was forced to enter into a $3.5 million settlement to address claims that were covered by the Hold Harmless Agreement, E&B obtained a contractual right from Excel to be indemnified for that amount. E&B's right to indemnification from Excel does not hinge on whether E&B's various insurers paid E&B's obligations or planned to exercise their separate subrogation rights.

¶ 98. The majority interprets the Hold Harmless Agreement as if E&B is entitled to indemnification from Excel when, and only when, E&B's insurers exercise their subrogation rights. In fact, the opposite is true. E&B's insurers are entitled to exercise subrogation rights when, and only when, E&B is entitled to indemnification from Excel. If an insurer waives its subrogation rights, E&B's underlying right to indemnification (which created the possibility of a subrogation right for the insurer in the first place) does not disappear.

¶ 99. The majority seemingly reads language into the Hold Harmless Agreement. Under the majority's reading, Excel is obligated to indemnify E&B from claims against it and judgments and expenses that result from those claims, *but only if either E&B pays those judgments and expenses out of its own pocket or one of E&B's insurers covers the judgments and expenses and then exercises its subrogation rights.* The emphasized language does not appear in the Hold Harmless Agreement, but under the majority's interpretation, the clause is read into the Agreement. The majority opinion gives us no reason for rewriting the parties' Agreement. This court should hold the parties to their Agreement.

¶ 100. Thus, I believe the majority misinterprets the Hold Harmless Agreement. Further, this court has held that indemnification agreements "are liberally construed when they deal with the negligence of the indemnitor [Excel here], but are strictly construed when the indemnitee [E&B here] seeks to be indemnified for his own negligence."[2] Here, the agreement deals with the negligence of the indemnitor (Excel), and the indemnitee (E&B) does not seek indemnification for its own 20% causal negligence. Under these circumstances, our case law commands a liberal construction of the Hold Harmless Agreement, which further supports my conclusion.

¶ 101. Therefore, I resolve this issue on the basis of the language of the Hold Harmless Agreement. The parties and the majority opinion also discuss the application of the collateral source rule to this contract dispute. Majority op., ¶¶ 69–70. The collateral source rule is generally associated with tort law. This fourth issue, which is a contract dispute, becomes more difficult when the collateral source rule is considered. The analysis of the parties and the majority regarding the collateral source rule is undeveloped, and I will touch on this issue only briefly.

¶ 102. The application of the collateral source rule to contracts cases is a complex subject. "Whether the collateral source rule applies in 'contract' cases is subject to some dispute. . . . Possibly the right answer depends somewhat on the equities or economic concerns in the individual case. . . . "[3]

---

[2] *Bialas v. Portage Cnty.*, 70 Wis. 2d 910, 912, 236 N.W.2d 18 (1975).

[3] 3 Dan B. Dobbs, *Dobbs Law of Remedies* § 12.6(4) at 154–55 (2d ed. 1993).

¶ 103. The collateral source rule is an equitable doctrine, as the majority notes. Majority op., ¶ 69. Each case has to be analyzed, as I see it, by asking how the various policies underlying the collateral source rule apply in the particular case, depending on whether the parties are connected by contract, tort, or some combination of the two. The unique circumstances of each particular case must be carefully considered.

¶ 104. The majority opinion disposes of the collateral source rule by simply characterizing E&B as a tortfeasor—because E&B was adjudged 20% causally negligent with respect to the non-Kriefall plaintiffs— and stating that "the policies that underlie the collateral source rule support its use to benefit only injured plaintiffs." Majority op, ¶ 70.

¶ 105. The majority's reasoning oversimplifies or mischaracterizes the present case. The present lawsuit is a contract dispute in which E&B *is* an injured plaintiff and Excel is a defendant. E&B is suing Excel to recover under the Hold Harmless Agreement. It was in the underlying lawsuit against the non-Kriefall plaintiffs that E&B was a 20% responsible tortfeasor and Excel was an 80% responsible tortfeasor.

---

For articles discussing the collateral source rule in contract cases, as well as the relevance of subrogation (or the lack of subrogation) in these cases, see Joseph M. Perillo, *The Collateral Source Rule in Contract Cases,* 46 San Diego L. Rev. 705 (2009), and John G. Fleming, *The Collateral Source Rule and Contract Damages,* 71 Cal. L. Rev. 56 (1983).

The Restatement (Second) of Contracts briefly alludes to the collateral source rule and does not take a position on its applicability, but states that "[t]he principle that a party's liability is not reduced by payments or other benefits received by the injured party from collateral sources is less compelling in the case of a breach of contract than in the case of a tort." Restatement (Second) of Contracts § 347 cmt. e (1981).

¶ 106. Here, the court should balance equitable considerations and the policies behind the collateral source rule to determine whether the breaching defendant (Excel) or the plaintiff (E&B), who was insured by Federal Insurance, should benefit from the payments made by Federal Insurance that Federal Insurance does not seek to recover.[4]

¶ 107. In the present case, under the Agreement, E&B shoulders the damages its conduct caused and Excel shoulders the damages its conduct caused. Applying the collateral source rule would ensure that Excel is not relieved from shouldering the damage its conduct caused just because E&B had the foresight to voluntarily pay premiums over the years in order to maintain insurance.[5] I therefore would apply the collateral source rule in the present case.

---

Professors Perillo and Fleming are both somewhat critical of the Restatement's limited analysis. *See* Perillo, *supra,* at 706; Fleming, *supra,* at 79.

[4] This court has addressed similar questions in tort suits when an insurer waives its subrogation rights or is unable to pursue them. In *Voge v. Anderson,* 181 Wis. 2d 726, 512 N.W.2d 749 (1994), the plaintiff's insurer had waived its subrogation rights, *id.* at 728, and the court held that the collateral source rule was still applicable. *Id.* at 732. The court explained:

> The collateral source rule does not allow a tortfeasor to reduce his or her liability for personal injury by benefits that the injured person receives from one acting on the tortfeasor's behalf. Rather, the collateral source rule requires that the tortfeasor be held responsible for his conduct by requiring the tortfeasor to compensate the injured party the full amount of damages.

> We recognize that the results in this case allow the injured party a double recovery. However, a contrary conclusion would result in giving the tortfeasor a windfall . . . .

*Voge,* 181 Wis. 2d at 732–33.

[5] According to Professor Fleming, "In the tort context, it

¶ 108. For the reasons stated above, I disagree with the majority's resolution of the "indemnification reduction" issue and dissent with respect to that issue.

¶ 109. I am authorized to state that Justice ANN WALSH BRADLEY joins this concurrence/dissent.

has been consistently considered decisive that if the plaintiff himself procured insurance through his own initiative and at his own cost, the defendant is not entitled to benefit from the insurance by a reduction of damages. As it is commonly put, the plaintiff is free to 'bargain for double recovery' even when . . . the insurer is not entitled to reimbursement." Fleming, *supra* note 3, at 81.

*See also Leitinger v. DBart, Inc.,* 2007 WI 84, ¶ 28, 302 Wis. 2d 110, 736 N.W.2d 1 ("The tortfeasor who is legally responsible for causing injury is not relieved of his obligation to the victim simply because the victim had the foresight to arrange, or good fortune to receive, benefits from a collateral source for injuries and expenses" (quoting *Ellsworth v. Schelbrock,* 2000 WI 63, ¶ 7, 235 Wis. 2d 678, 611 N.W.2d 764).).