PER CURIAM.
¶1 These appeals involve a dispute between Trust Point, Inc., trustee of the Gerhard G. Poehling Family Trust (the "Trust" or "Main Trust"), and two trust beneficiaries, John Poehling, Sr., and John Poehling, Jr. (the "objectors"). After significant conflict between the objectors and Trust Point, the decision was made that a new separate trust (the "Segregated Trust") would be created for the benefit of the objectors. On appeal, the objectors challenge several aspects relating to the creation and funding of the Segregated Trust. We reject all of the objectors' challenges and, therefore, affirm the circuit court.
Background
¶2 We provided details of the history of this dispute in the background sections in our prior decisions in this long-lasting conflict. See Poehling v. Trust Point, Inc. , No. 2012AP1817, unpublished slip op. (WI App May 16, 2013); Poehling v. Trust Point, Inc. , No. 2014AP529, unpublished slip op. (WI App Apr. 2, 2015). We do not repeat the background in as much detail here.
¶3 The objectors, and their immediate family members, held a one-sixth interest in the Main Trust. The Main Trust had two main assets: a family plumbing supply business, First Supply, owned by Prometheus Group, Inc. ("PGI"); and real estate held by Parkk Real Estate LLC. None of the parties suggest that the existence of Parkk affects this appeal and, for ease of discussion, we speak as if the Main Trust directly owns the real estate.
¶4 Starting at least as early as 2008, the objectors began complaining in court proceedings about Trust Point's administration of the Main Trust and the effectiveness of the management of PGI. The objectors sought a "buy-out" or a segregation of their interest in the Main Trust. The dispute culminated in a series of proposed agreements and orders that would create a Segregated Trust for the benefit of income beneficiary John Poehling, Sr., and his offspring remainder beneficiaries, represented in the present actions by the objectors.
¶5 There was much back and forth, consisting of objections, arguments, rulings, and revisions to a proposed order governing the creation of the Segregated Trust. The primary disputes centered on the valuation of PGI stock and real estate owned by the Main Trust. A court trial was held to resolve the primary factual dispute regarding the value of PGI stock. Other disputes, including some that have an effect on the valuation of real estate or have an immediate or eventual effect on the funding relating to PGI stock, were resolved on summary judgment. The end product was a long and detailed circuit court order filed March 28, 2017, modified in part by an order issued December 20, 2017. The Segregated Trust was established and funded on December 29, 2017.
¶6 We reference additional facts in the discussion section below, as necessary.
Discussion
I. The Trial-Valuation of PGI Stock
¶7 The objectors challenge the circuit court's valuation of PGI stock following the court trial. We first summarize our standards of review, and then address the objectors' arguments.
¶8 In an action tried to the circuit court, the court "shall find the ultimate facts." WIS. STAT. § 805.17(2) (2017-18).[1] "Findings of fact shall not be set aside unless clearly erroneous, and due regard shall be given to the opportunity of the trial court to judge the credibility of the witnesses." Id. Our supreme court has stated:
Findings of fact by the trial court will not be upset on appeal unless they are against the great weight and clear preponderance of the evidence. The evidence supporting the findings of the trial court need not in itself constitute the great weight or clear preponderance of the evidence; nor is reversal required if there is evidence to support a contrary finding. Rather, to command a reversal, such evidence in support of a contrary finding must itself constitute the great weight and clear preponderance of the evidence.
Cogswell v. Robertshaw Controls Co. , 87 Wis. 2d 243, 249-50, 274 N.W.2d 647 (1979).
¶9 To the extent the objectors make legal arguments regarding the trial, our review is de novo. See Ball v. District No. 4, Area Bd. of Vocational, Tech. & Adult Educ. , 117 Wis. 2d 529, 537, 345 N.W.2d 389 (1984).
¶10 The objectors argue that the circuit court improperly adopted a valuation of the PGI stock that was below the stock's fair market value. The objectors contend that the circuit court erred by failing to recognize that PGI had been poorly managed and that the valuation the court accepted was improperly and negatively affected by that poor management. As best we understand the objectors' argument, it proceeds as follows:
1) The circuit court adopted a fair market valuation that was based on the historic performance of PGI and the assumption that the same level of performance would continue.
2) As a matter of law, the fair market value of a corporation must be based on the assumption that the corporation will be managed in a reasonably prudent manner going forward, regardless of past poor management.
3) The circuit court, contrary to the above legal proposition, decided that it was not relevant whether PGI's historic profitability performance was poor due to poor management which, in turn, led the court to erroneously rule that it would not decide whether PGI's current performance was the result of poor management.
4) As to the historic management of PGI, the only finding supported by the record is that PGI had been poorly managed.
¶11 We accept, for purposes of this opinion only, the first two propositions. That is, we will assume for purposes of this discussion that the circuit court adopted a fair market valuation based on PGI's historic performance and the assumption that the same level of performance would continue, and that estimates of the fair market value of a corporation should be based on the value of the corporation, if reasonably managed, going forward. Further, although we will explain below that we conclude that the "fair market value" language in WIS. STAT. § 701.0417(4) does not apply here, there is no dispute that the parties and the circuit court intended that valuation of PGI stock be its fair market value.
¶12 However, we reject the objectors' valuation challenge because we reject propositions 3 and 4 above.
¶13 Regarding the third proposition, we acknowledge that the circuit court said that it would not make a decision as to whether PGI had been poorly managed, but the record shows that the circuit court did make such a decision. The circuit court stated in its oral ruling:
There's been much effort placed on the attempt to show that [PGI] has not been managed properly, that if it were better managed, that in essence the value of the company would be higher. The assertion is that a willing buyer would pay more for the company because of confidence that they could manage the company better and achieve greater returns.
Mr. Stumpf is of the opinion that those factors are taken into account, but from the Court's perspective, his role is to place a value on the company as it exists today, as opposed to what a similar company like First Supply might look like under different management.
I've not been shown that [PGI] is poorly managed. Certainly, Mr. Stumpf accepted the proposition that this is a price intensive industry, that it's an industry in which prices can readily be compared. [PGI] had made the strategic decision to focus on volume as opposed to price. That approach is something that's criticized by the objectors, but at least from Mr. Stumpf's perspective, and I accept that, that's a reasonable business decision given the industry that [PGI] is involved in.
(Emphasis added.) Thus, although it appears that the circuit court believed that it did not need to resolve whether PGI had been poorly managed, the court nonetheless addressed the dispute and found that the evidence did not show that PGI had been poorly managed.
¶14 The objectors' fourth proposition is that the record does not support a finding that PGI was not poorly managed. We disagree.
¶15 We begin this part of our discussion by observing that the objectors have taken on an exceedingly difficult task. The circuit court's rejection of the objectors' poor management argument is a factual finding. And, we may not reject fact-finding by a circuit court merely because there is evidence supporting a contrary finding. See Noll v. Dimiceli's, Inc. , 115 Wis. 2d 641, 643, 340 N.W.2d 575 (Ct. App. 1983). Rather, to require reversal the contrary evidence must constitute the great weight and clear preponderance of the evidence. See id. at 643-44. Moreover, the circuit court's finding here involved assessing the relative credibility of expert witnesses, which the circuit court resolved in favor of the valuation the court adopted. We have no authority to overturn a finding based on witness credibility unless the finding is contrary to conceded facts or the laws of nature. See Chapman v. State , 69 Wis. 2d 581, 583, 230 N.W.2d 824 (1975).
¶16 The objectors do not come close to meeting their burden.
¶17 In the section of their appellate brief addressing the trial evidence, the objectors devote little time to actually discussing the evidence. To the extent the objectors discuss the evidence, they focus almost exclusively on a limited portion of the testimony of a single witness. In essence, the objectors argue that the circuit court was required to find that PGI had underperformed in the past because PGI's own expert witness, Gregory Heebink, acknowledged underperformance. So far as we can tell, the objectors are referring to Heebink's testimony that, in recent years, PGI had "below average profitability" when compared with recently sold companies that Heebink deemed comparable.
¶18 This reliance on Heebink's testimony is unavailing for several reasons. First, the circuit court expressly found Trust Point's expert, Aaron Stumpf, more credible than Heebink. The court stated: "I'm accepting Mr. Stumpf's valuation over that of Mr. Heebink for a couple of reasons." Second, the argument ignores contrary evidence, such as Stumpf's testimony questioning the comparability of the companies Heebink relied on because those companies were publicly traded and many times larger and Stumpf's testimony that PGI's "revenue growth rate [was] more than double ... what the industry is growing [and that he] did not view [PGI] to be ... poorly managed." Third, the discussion obviously fails to show that the circuit court's performance finding is contrary to the great weight and clear preponderance of all of the trial evidence.
¶19 In sum, we reject the objectors' argument that the circuit court erroneously adopted a valuation of the PGI stock that was below the stock's fair market value.
II. Summary Judgment
¶20 The remainder of the objectors' arguments on appeal relate to the circuit court's resolution of several aspects of Trust Point's summary judgment motion. We review summary judgment de novo, construing the facts and reasonable inferences from those facts in favor of the nonmoving party. Strozinsky v. School Dist. of Brown Deer , 2000 WI 97, ¶32, 237 Wis. 2d 19, 614 N.W.2d 443. Summary judgment is granted if there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law. WIS. STAT. § 802.08(2).
¶21 To the extent the objectors challenge the circuit court's discretionary or equitable decision-making based on undisputed facts, our review is deferential. We will reverse only if we conclude that the circuit court has misused its discretion. See Singer v. Jones , 173 Wis. 2d 191, 194-95, 496 N.W.2d 156 (Ct. App. 1992). In this regard, we observe that, to the extent the objectors dispute Trust Point's assertion that several of the summary judgment issues involve a review of discretion, the objectors simply argue that courts do not have discretion to fail to comply with statutory directives. We agree with this principle. However, as we shall see, we disagree with the objectors that various decisions made by the circuit court conflict with any statutory directive.
¶22 We address the objectors' challenges to summary judgment in the subsections below.
A. Whether The "Fair Market Value" Requirement In WIS. STAT. § 701.0417 Prohibited A Capital Gains Tax Provision In The Order
¶23 The circuit court directed that cash equaling the value of one-sixth of PGI stock be distributed to the Segregated Trust. The objectors challenge the circuit court's additional order that the Segregated Trust eventually pay an amount to the Main Trust to compensate for expected capital gains tax consequences of the eventual sale of PGI stock. More specifically, the court's order requires the Segregated Trust, at the time the Main Trust is terminated, to pay either (1) an amount equal to what would be the current capital gains tax if one-sixth of the PGI stock was sold at the valuation put on that stock by the court or (2) a lower amount if there is an actual sale of PGI stock prior to termination of the Main Trust and if one-sixth of the actual capital gains tax is a lower amount.
¶24 The objectors contend that WIS. STAT. § 701.0417(4) required Trust Point to, in the objectors' words, "distribute an amount of cash equivalent to one-sixth of the 'current fair market value' of the stock" and that § 701.0417(4) does not authorize reducing the objectors' one-sixth share of that valuation to compensate for the capital gains tax consequences should beneficiaries of the Main Trust ever sell PGI stock. Stated differently, the objectors argue that, for purposes of compliance with § 701.0417(4), "[i]t is not relevant that the main Trust may incur gains tax liability if Trust Point one day sells the PGI stock that it now is retaining in the main Trust" because the statute does not authorize anything other than the distribution of the fair market value of the stock.
¶25 We are not persuaded. First, we conclude that WIS. STAT. § 701.0417(4) does not apply here. Second, even if the subsection does apply, we fail to see why it governs the amount of the distribution to the Segregated Trust.
¶26 As pertinent here, WIS. STAT. § 701.0417 authorizes a trustee to divide a trust into two or more trusts and further reads:
(2) Subject to the terms of the trust, the trustee may take into consideration differences in federal tax attributes and other pertinent factors ... in making distributions....
....
(4) In case of a division of a trust into 2 or more trusts, any distribution ... of assets as an equivalent of a dollar amount ... shall be made at current fair market values ....
¶27 It is undisputed that the distribution from the Main Trust to the Segregated Trust-to compensate the Segregated Trust beneficiaries for their share of the value of the PGI stock-was in the form of cash. PGI argues that WIS. STAT. § 701.0417(4) does not apply to the distribution because its plain language addresses only the distribution of non-cash assets . This is true, PGI explains, because the subsection requires "distribution ... of assets as an equivalent of a dollar amount," valuing the assets at current fair market value, meaning that when a trustee distributes assets from a trust into a newly created trust, such assets must be the equivalent "of a dollar amount." Obviously, PGI contends, this directive makes no sense if the asset transferred is cash. To this we add that the fair market value restriction makes no sense with respect to cash. It is axiomatic that the fair market value of cash is its face value.
¶28 PGI points to Morkin v. Clancy (Estate of Naulin) , 56 Wis. 2d 100, 201 N.W.2d 599 (1972), as an example of the proper application of WIS. STAT. § 701.0417(4). In Estate of Naulin , where a trust needed to be funded in the amount of $97,383, and the funding was to be in the form of non-cash assets, the predecessor statute to § 701.0417(4) required that the non-cash assets actually have a value of $97,383. See Estate of Naulin , 56 Wis. 2d at 105-06.
¶29 The objectors disagree, stressing WIS. STAT. § 701.0417(4) 's use of the words "any distribution or allocation." This language, however, does not undercut PGI's argument or our reasoning above. That is, "any distribution or allocation" is easily read as the distribution or allocation with respect to non-cash assets.
¶30 The objectors go on to rely on a mischaracterization of the transaction here. According to the objectors, "Trust Point allocated the Trust's PGI stock between the main Trust and the Segregated Trust by first conducting a trial to determine a dollar amount for the value of that stock, and then distributing cash equal to one-sixth of that dollar amount to the Segregated Trust while leaving 100% of the stock in the main Trust." This characterization goes nowhere because it gets off on the wrong foot when it states: "Trust Point allocated the Trust's PGI stock between the main Trust and the Segregated Trust ...." This is incorrect. The PGI stock (i.e., the PGI as a corporation) was valued as a whole. No stock was "allocated" between the Main Trust and the Segregated Trust.
¶31 Finally, the objectors complain that "PGI does not explain how any other interpretation would make sense or what valuation standard should be used if not 'current fair market value.' " However, it is not apparent why WIS. STAT. § 701.0417(4) must be construed to cover distributions of cash from an initial trust to newly created trusts under § 701.0417. In this regard, we think it obvious that distributions are constrained by other principles applicable to both trustees and circuit court discretion. Indeed, regardless of § 701.0417(4), PGI does not dispute that, for calculating the distribution of cash to the Segregated Trust, the starting point is establishing the fair market value of PGI stock.
¶32 To sum up, it appears to us that the objectors' interpretation of WIS. STAT. § 701.0417(4) requires improperly reading additional language into the statute. We conclude that the language the legislature did use does not extend to cash distributions.
¶33 Moreover, even if WIS. STAT. § 701.0417(4) did apply to the distribution of cash in this case, we fail to see why the language of that subsection governs the amount of the distribution. The subsection seemingly assumes that the distribution amount is otherwise determined and then the assets transferred to satisfy that amount must be valued "at current fair market values." See id. This is not to say that other parts of § 701.0417 do not apply. Of course they do. Indeed, as to the amount of a distribution, § 701.0417(2) seemingly authorizes the modification here because it authorizes a trustee to "take into consideration differences in federal tax attributes and other pertinent factors ... in making distributions."
B. Whether The Capital Gains Tax Provision In The Order Is Inequitable Because The Non-Objector Beneficiaries May Never Sell Their Stock
¶34 The objectors argue that, even if WIS. STAT. § 701.0417(4) does not prohibit the capital gains order, the order is nonetheless a misuse of discretion because it "clearly favors" the Main Trust beneficiaries over the Segregated Trust beneficiaries. More specifically, the objectors argue that the payment procedure in the order is unfair because, if the PGI stock is not sold prior to the termination of the Main Trust, and if the Main Trust remainder beneficiaries receive PGI stock and do not sell it, then the Main Trust remainder beneficiaries will not pay capital gains tax even though the beneficiaries of the Segregated Trust must, in effect, pay the capital gains reimbursement amount. The objectors further point out that the Main Trust remainder beneficiaries will have an advantage because they will have use of the money paid by Segregated Trust during any time period between the termination of the Main Trust and the sale of their PGI stock.
¶35 In sum, according to the objectors, because the order requires a payment by the Segregated Trust even if there is no sale of PGI stock, the order does not serve its stated purpose because that purpose assumes, in the words of the order, "an actual redemption or sale of stock of PGI." We are not persuaded.
¶36 First, the circuit court obviously assumed that the PGI stock would be sold prior to the termination of the Main Trust. The objectors do not explain why this is not a reasonable assumption. And, the assumption seems more than reasonable. For example, it is reasonable to assume that fractional interests in PGI will not be easily sold separately. That is, it is reasonable to assume the Main Trust remainder beneficiaries will be better off financially if PGI stock is sold as a whole prior to termination of the Main Trust than if the multiple fractional owners attempt to cash in individually at some later date or series of dates.
¶37 Our speculation on this topic is, however, beside the point. The real problem with the objectors' assertion that the circuit court was insufficiently concerned with a particular scenario-one where the Main Trust remainder beneficiaries end up with stock after the termination of the Main Trust-is that the objectors do not address the likelihood of that scenario coming to pass. That is, the objectors do not persuade us why this scenario would have been worthy of the circuit court's concern.
¶38 We also observe that the objectors' argument does not take into account the risk that PGI stock may decline in value, even if sold prior to termination of the Main Trust. If that happens, the beneficiaries of the Segregated Trust will benefit from having been bought out, so to speak, at a higher valuation while at the same time paying capital gains based on a lower valuation.
¶39 The objectors rely on Dunn v. Commissioner of Internal Revenue , 301 F.3d 339 (5th Cir. 2002), for their assertion that when, as here, the income approach is used to determine fair market value, such a valuation should not include a reduction for capital gains tax liability. We conclude that the objectors' reliance on Dunn is misplaced. It is true that the Dunn court held that "built-in gains tax liability would have no place in the calculation of [a corporation's] earnings -based [i.e., income-based] value." Id. at 353. But this holding has no application here. The fair market valuation of the PGI stock was not calculated using a method that took into account hypothetical capital gains. Rather, the question at hand is whether, having determined the fair market value of PGI stock and having transferred that amount to the Segregated Trust, the circuit court properly directed that there be a future payment relating to an expected capital gains tax. Dunn sheds no light on that topic.
¶40 Accordingly, the objectors have not shown that the circuit court misused its discretion with respect to the part of its order making a provision for a future "capital gains tax" payment under the conditions specified.
C. Whether The PGI Stock Valuation Was Incorrect Because It Was Based On An Incorrect Valuation Date
¶41 The objectors argue that the circuit court's determination of the fair market value of the PGI stock, $21,650,000, violates WIS. STAT. § 701.0417(4) because the valuation date, September 30, 2014, was more than three years prior to the actual distribution. The objectors point to § 701.0417(4) 's language stating that the "distribution ... shall be made at current fair market values" (emphasis added). The objectors argue that the word "current" in this language means that the estimates must be "current" as of the date of distribution. We reject the argument.
¶42 First, the objectors rely on WIS. STAT. § 701.0417(4), and, as we have explained, the subsection does not apply to the cash distributed to the Segregated Trust in lieu of PGI stock.
¶43 Second, whether WIS. STAT. § 701.0417(4) applies or not, the objectors fail to persuade us that we should reverse the circuit court.
¶44 We perceive no dispute that, in the absence of the sort of complicating factors present in this case, a distribution based on the fair market value as of the distribution date was desirable, but never practical. Indeed, the objectors expressly conceded before the circuit court that the valuation date need not be the actual distribution date, and the objectors have not otherwise presented an argument as to just how current the valuation must be.
¶45 To the contrary, in 2014 the objectors stipulated that the value of PGI stock as of September 30, 2014, could be used for purposes of funding the Segregated Trust. This stipulation is significant because, at the time, the objectors would have known that there was not yet a valuation report, that the objectors might dispute the valuation, and, as the objectors themselves point out in their appellate reply brief, that Trust Point had not yet even petitioned for the division of the Trust. Given the remaining disputes and overall complexity of the matter, the objectors would have known that they were stipulating to a date that was substantially in advance of any possible distribution.
¶46 It is not surprising, then, that about two years after the stipulation, when the objectors did raise its one-time objection to the staleness of the valuation, their argument was, essentially, that a one-year delay was acceptable, but that something more than two years was not acceptable. Plainly, this is a concession that there is a broad range that might be reasonable in terms of how current a valuation must be.
¶47 Moreover, the relief requested before the circuit court was not a more "current" appraisal of PGI stock. Rather, the objectors asked the circuit court to look at the "rate of return on trusts [Trust Point] administers which are invested in a diversified portfolio of stocks and bonds." The objectors asked the court to increase the one-sixth PGI stock amount, $3,608,033, by hypothetical earnings if that amount had been held in a Trust Point investment portfolio. So far as we can tell, this remains the objectors' requested relief because they do not, on appeal, indicate what relief they seek other than reversal of the denial of the request they made before the circuit court.
¶48 The bottom line here is that the objectors present no developed statutory construction argument regarding the meaning of "current" in WIS. STAT. § 701.0417(4) and the objectors did not argue before the circuit court, at any point in time, that the statute required a more current valuation. Rather, the only preserved argument by the objectors is the proposition that the circuit court misused its discretion by not adding an "investment portfolio" increase to the September 2014 valuation. As to this proposition, the objectors make no discernible argument on appeal, and we perceive no reason why any such argument might prevail.
¶49 In rejecting the objectors' request for an "investment portfolio" increase, the circuit court observed that it had no information before it showing that such a portfolio rate of return would measure any appreciation of PGI stock, particularly "at a time when the market for stocks and bonds is approaching all time highs." The circuit court also aptly noted the objectors' role in the delay, stating that "[t]ime has been consumed by the objectors' decision to litigate this further after the appraisal was received." And, the circuit court noted that the value of the PGI stock might have declined in the interim; the court's point being that the stipulated valuation date insulated the Segregated Trust beneficiaries from any such decline.
¶50 To this, we add our agreement with Trust Point's observation that "[i]t is ironic that, despite [the objectors'] complaint that 'PGI's own value has grown poorly under Joe Poehling's leadership,' [the objectors] also claimed that the delay caused by their decision to litigate entitled them to 'additional cash' equal to the growth 'in a diversified portfolio of stocks and bonds' " (citation to objectors' brief omitted). That is, we agree it is inconsistent to strenuously argue that a company is poorly managed and then ask the circuit court to assume that the same company under the same management has had an increase in value comparable to a robust stock market.
¶51 For the reasons above, we reject the objectors' argument that the circuit court erred in adopting the PGI stock valuation because the valuation was insufficiently current.
D. Whether Reliance On Bank Appraisals To Value Real Estate Was Improper
¶52 As we have explained, the Segregated Trust was also funded with an amount of money relating to the real estate holdings of the Main Trust. On this topic, the objectors argue that the circuit court violated the "fair market value" requirement in WIS. STAT. § 701.0417(4) by adopting Trust Point's proposal to use "bank appraisals." According to the objectors, the use of bank appraisals-appraisals obtained by mortgage lenders-is error because (1) such appraisals are, as a matter of law, below fair market value, and (2) the record here demonstrates that such appraisals are below fair market value. We reject both arguments.[2]
1. Are Bank Appraisals Too Low As A Matter of Law?
¶53 The objectors assert that bank appraisals "tend to skew conservative" and are, therefore, below fair market value. In support, the objectors point to three cases from other jurisdictions. See Hayden v. Denos , Case No. 1:14-BK-11187-MT, Adv. No. 1:14-AP-01182-MT, 2015 WL 9491310, at 8 (Bankr. C.D. Cal. Dec. 28, 2015) (appraisal at issue "was made for underwriting a loan, which suggests that it is likely to be more conservative"); Casey v. Nationsbank of Texas , 173 B.R. 581, 585 (Bankr. E.D. Tex. 1994) (stating "it should come as no surprise that a conservative lending institution such as a bank would generally favor conservative appraisals for the purpose of risk allocation"); Quinn v. United States , No. N-75-481, 1976 WL 947, at 10 (D. Md. Apr. 1, 1976) (stating that court did not give "complete credence" to the value in a bank appraisal because of "the conservative nature of most bank appraisals and ... the discrepancies apparent in [that] bank appraisal").
¶54 The apparent import of this case law is that it should persuade us to accept, as a legal premise, that bank appraisals are always below fair market value. We decline this apparent invitation for a simple reason. While there is common-sense appeal to the proposition that bank appraisals are generally conservative, the question whether particular appraisals or planned appraisals are or can be expected to be reliable indictors of fair market value is inherently a factual issue, not a legal one.
2. Does The Record Here Show That Bank Appraisals Are Too Low?
¶55 The objectors directed the circuit court's attention to evidence showing that Main Trust real estate had previously sold for amounts significantly above the properties' prior bank-appraised values. It follows, according to the objectors, that they demonstrated to the circuit court that any future bank appraisals would be below fair market value and, therefore, the circuit court erred when it declined to order "independent" appraisals. This historical appraisal and sales information is undisputed, but it does not compel the conclusion that the circuit court misused its discretion when it approved the use of the particular planned bank appraisals.
¶56 If the objectors mean to argue that there is a factual dispute as to whether bank appraisals reflect fair market value, that is, a factual dispute that prevents summary judgment on the topic, they have forfeited that argument. Although our review of summary judgment is de novo and, thus, parties are often permitted to make new arguments on appeal, the application of forfeiture is appropriate when a new argument could have been rebutted with factual information. See Gruber v. Village of North Fond du Lac , 2003 WI App 217, ¶27, 267 Wis. 2d 368, 671 N.W.2d 692. Here, it is true that, before the circuit court, the objectors made the underlying factual argument that particular prior sales showed that bank appraisals are generally below fair market value. But, the objectors did not argue that the prior property sales created a factual dispute that prevented the circuit court from exercising its discretion to approve the use of planned bank appraisals for purposes of valuing the real estate.
¶57 Rather, the objectors' counsel pointed to the sales information and simply argued that "Trust Point's [proposal] is ... unfair to [the objectors] because it relies on bank appraisals, done for the purpose of loan refinancings, to determine the value of the property owned by [Trust Point]." So far as the circuit court would have understood, the objectors were simply asking it to decide that their preferred approach, an independent appraiser, was a fairer approach. If the objectors had made clear that they were raising a factual dispute that prevented a court decision on the topic, the opposing parties and the court would have had the opportunity to deal, factually, with that argument. Accordingly, we deem forfeited any argument that a factual dispute prevented summary judgment.
¶58 To the extent the objectors challenge a discretionary decision to rely on planned bank appraisals, we have no trouble affirming the circuit court. As the circuit court observed, the prior sales, as compared with earlier appraisals, "may simply reflect the unique characteristics of a particular buyer or a change in market conditions." And, the circuit court took additional steps to protect the objectors and prompt the appraiser to appraise at fair market value. The circuit court's order specifies that the real estate be appraised at "fair market value" using "Uniform Standards of Professional Appraisal Practice," that such appraisals will "be used by the Trust and the beneficiaries of the Trust to determine the value of the real estate in order to segregate the interests of one group of beneficiaries from the Trust," and provides for an adjustment if property was actually sold within two years of the distribution date.
¶59 For the reasons above, we affirm the circuit court's order with respect to the appraisals of the real estate controlled by Trust Point.
E. Whether The Indemnification Clause Creates Improper Risk
¶60 The circuit court's order provides that, if the transactions creating the Segregated Trust cause any unintended tax consequences, the "Segregated Trust and the Segregated Parties, jointly and severally," must defend and indemnify the Main Trust and its beneficiaries. The objectors contend that this indemnification contingency may improperly put the beneficiaries of the Segregated Trust, as individuals , at risk. More generally, the objectors assert that the indemnification clause "has no foundation in the law." The objectors may also be making a general unfairness argument.
¶61 We address all three arguments more specifically below. But we first conclude that the beneficiaries-as-individuals-at-risk argument is forfeited because it is made for the first time on appeal. Our review of the record discloses a single objection to the indemnification clause made in a letter dated February 9, 2017. In that letter, the only argument against the indemnification clause is as follows:
Trust Point has determined to create the Segregate[d] ... Trust, and has crafted the transactions to accomplish that in a manner it believes is tax free. There is no reason why Objectors should bear the risk of Trust Point being wrong in its tax analysis.
Because this general fairness argument gives no hint of the beneficiaries-as-individuals-at-risk theory, reversing based on this argument would "blindside" the circuit court with a theory that "did not originate in [its] forum." See State v. Rogers , 196 Wis. 2d 817, 827, 539 N.W.2d 897 (Ct. App. 1995) ("We will not ... blindside trial courts with reversals based on theories which did not originate in their forum."). Here, although it does not appear that the forfeited argument raises a factual issue that might have been rebutted, this is a matter the circuit court could easily have addressed in a timely manner if the court did not mean to impose individual liability. Accordingly, we deem the argument forfeited.[3]
¶62 Moreover, we do not find any of the objectors' arguments persuasive.
¶63 As to whether individual beneficiaries of the Segregated Trust might be liable, the objectors merely argue that "it is unclear" whether the order might have that effect. The objectors are apparently concerned that the indemnification clause not only has the potential to reduce the distributions from the Segregated Trust to beneficiaries, but also to create individual out-of-pocket liability. At least in theory, this would mean that a beneficiary of the Segregated Trust could end up worse off than a non-beneficiary. This seems an absurd result, and the objectors do not explain why this might be a reasonable reading of the indemnification clause.
¶64 Regardless, we conclude that this alleged lack of clarity is an insufficient reason to reverse. If it turns out that there are unintended tax consequences and if such consequences are not fully covered by the Segregated Trust, the issue can be addressed at a later date.
¶65 As to whether the circuit court had the authority to impose the indemnification clause, the objectors contend that the only possible authority is the law of equitable indemnification articulated in Estate of Kriefall v. Sizzler USA Franchise, Inc. , 2012 WI 70, 342 Wis. 2d 29, 816 N.W.2d 853. The objectors, however, fail to demonstrate that this is the exclusive source of authority.
¶66 The objectors seemingly believe that the following statement in Estate of Kriefall supports their exclusive-authority proposition: "Indemnification can arise by contract or it can be based on equitable principles." See id. , ¶34. Using this Estate of Kriefall language as a starting point, the objectors argue that neither "by contract" nor equitable indemnification is applicable here. We are not persuaded. Even assuming that the sort of equitable indemnification discussed in Estate of Kriefall does not apply here, a proposition we question, and further assuming there is no contractual basis for the indemnification order, the sentence in Estate of Kriefall that the objectors point to does not state that indemnification cannot arise under other situations based on other authority.
¶67 Trust Point argues that the circuit court had the discretion to order equitable relief under WIS. STAT. ch. 701. See WIS. STAT. § 701.0201(1) and (3) (providing that a court "may intervene in the administration of a trust to the extent its jurisdiction is invoked by an interested person or as provided by law"; and such proceedings may involve "[d]etermining the existence or nonexistence of any immunity, power, privilege, duty, or right" and "[d]etermining any other matter involving a trustee, directing party, trust protector, or beneficiary"). We agree with Trust Point that this broad language supplies the necessary authority and that nothing in Estate of Kriefall precludes reliance on that authority.
¶68 Finally, we address the general fairness of the indemnification clause. We acknowledge that the objectors make a valid point when they critique the reasoning of the circuit court-given in response to the argument the objectors did make before that court-because the reasoning does not appear to address the indemnification language that the objectors contended was improper. But the objectors' attack on that response by the circuit court is not enough. The objectors must persuade us that the clause is an unreasonable exercise of discretion, not simply that the circuit court missed the mark when responding to the objectors' objection.
¶69 As to the fairness issue, the parties' primary dispute is over whether the need for a buy-out, and, thus, the creation of the Segregated Trust, was prompted by the objectors. In that regard, although it is true, as the objectors state in their appellate reply brief, that they did not demand the segregation order issued by the circuit court, our review of the record persuades us that Trust Point is correct in stating in its response brief that the "impetus behind the Trust division was [the] Objectors' demands that the Trust 'buy-out,' segregate their interest, and/or sell PGI and [the Main Trust real estate]." Thus, we agree that the objectors prompted the need to engage in the complex transactions necessary to enable the Main Trust to buy out the objectors and, therefore, that it is equitable to put the risk of unintended consequences on the objectors.
F. Whether Approval Of Trust Administration Was Error
¶70 The objectors contend that the circuit court erred by approving Trust Point's administration of the Main Trust for the time commencing May 1, 2013, and ending August 31, 2015. We have twice before, with respect to two prior time periods, affirmed the circuit court's approval of Trust Point's administration of the Main Trust. We do so once again.
¶71 The objectors' short discussion begins with the following two-step argument:
1. Hallin v. Hallin , 228 Wis. 2d 250, 596 N.W.2d 818 (Ct. App. 1999), states that "evidence of a trust accounting must be 'clear, distinct and accurate' " and that "the trustee has the burden of 'showing on the accounting how much principal and income [the trustee] has received and from whom, how much disbursed and to whom, and what is on hand at the time.' " Id. at 256, 258 (quoted sources omitted).
2. Trust Point failed to comply with Hallin because Trust Point "did not make a prima facie case" that it complied with the Trust requirement that all net income be distributed annually to the trust's income beneficiaries.
This argument is logically flawed on its face. The Hallin language the objectors point to does not address Trust Point's decision-making regarding the distribution of income. Rather, the Hallin language requires that trust accounting be accurate in showing income received and disbursed. Obviously, Trust Point's accounting may have been accurate and complete as to its handling of income even if Trust Point did not comply with a requirement in the Trust.
¶72 If the objectors mean to argue that the circuit court erred in approving the administration of the Trust because the accounting provided shows that Trust Point failed to comply with an income distribution requirement in the Main Trust, the objectors' argument is undeveloped. As a legal matter, our own prior decisions indicate that the income distribution requirement is as simple as the objectors suggest. As a factual matter, the objectors do not walk us through the record to give context to whatever legal argument they might mean to make.[4]
¶73 The only other recognizable argument made by the objectors starts with the objectors' characterization of a 2011 circuit court ruling in this case accepting, in the objectors' words, "Trust Point's argument that it has discretion to allocate the Trust's receipts differently between income and principal in the Trust's accounts than it does for tax or other statutory purposes" and that "Trust Point must act impartially in making such allocations." The objectors then assert, without citation to the record, that:
Trust Point ... failed to submit any documentation to the circuit court showing how it exercised its discretion to allocate the Trust's receipts between income in the Trust's accounting, or how that allocation differed during the 2013-2015 period from the allocation used for tax reporting and other statutory purposes. Trust Point's accounts thus gave the Court no prima facie basis to determine whether Trust Point appropriately exercised its discretion in making the allocations permitted by the circuit court's 2011 decision.
(Emphasis added.) Perhaps the objectors are saying that the circuit court's 2011 ruling gave Trust Point discretion of some sort and simultaneously created a requirement that Trust Point document that exercise of discretion. We are unsure. What is clear is that this argument is also legally and factually undeveloped.
¶74 Although we could stop here, we make two more observations.
¶75 First, as to the accuracy of the accounting, Trust Point directs our attention to its petition for approval of accounts and the supporting statements, and then asserts that the objectors have failed to point to any inaccuracies in these materials. Neither the objectors' brief-in-chief nor their reply brief identifies any alleged inaccuracies.
¶76 Second, as to the objectors' challenge to income-distribution decision-making, Trust Point responds by pointing to law indicating that the objectors, not Trust Point, have the burden of proof. Indeed, in the context of income distribution, we have agreed with Trust Point on this very topic in both of our prior decisions. In the most recent 2015 decision, we relied on our 2013 decision when we wrote:
Although Trust Point is the petitioner and the party that moved for summary judgment, Trust Point argues that the Poehlings, as objectors, have the burden of proof. The Poehlings do not dispute that the burden is theirs. And, we have determined, in prior litigation between the Poehlings and Trust Point, that in these circumstances the Poehlings, as the objectors, carry the burden.
Poehling , No. 2014AP529, ¶4 (citing Poehling , No. 2012AP1817, ¶44). The objectors' meager reply is as follows: "Trust Point's response [appellate brief] concedes that it provided no basis for determining how it exercised its discretion, but argues it did not need to do so. This is wrong, for the reasons pointed out in the opening brief." As we have explained, the language in Hallin that the objectors rely on does not demonstrate that Trust Point is wrong, and the objectors did not, in their opening brief, otherwise provide reasons why Trust Point is wrong.
Conclusion
¶77 For the reasons above, we affirm the circuit court in all respects.
By the Court. -Orders affirmed.
This opinion will not be published. See WIS. STAT. RULE 809.23(1)(b)5.

All references to the Wisconsin Statutes are to the 2017-18 version unless otherwise noted.

Once again, the objectors' starting point for this "fair market value" argument is Wis. Stat. § 701.0417(4). We repeat that § 701.0417(4) does not apply when cash is used to fund a trust created under § 701.0417. But once again this misplaced reliance on § 701.0417(4) does not affect our analysis because it is undisputed that the goal here was to distribute to the Segregated Trust one-sixth of the fair market value of the real estate.

For that matter, so far as we can tell, the objectors' no-foundation-in-law argument is made for the first time on appeal. We do not, however, treat this argument as forfeited because it is not apparent what the circuit court could have done differently if the argument was brought to its attention, other than to eliminate the indemnification clause.

The objectors' sole reference to the record in support of its factual claim that Trust Point failed to fulfill its income distribution obligation is a cite to an affidavit of its own attorney filed in April of 2011. Although in affidavit form, this document, by itself, is nothing more than an argument by an attorney. But more problematic is that the affidavit predates the accounting period covered by the circuit court's order by more than two years.